[No. C006504. Third Dist. Dec. 24, 1990.]

In re CRYSTAL K., a Minor.
CYNTHIA W., Petitioner and Respondent, v.
JOSEPH K., Objector and Appellant.

## COUNSEL

Mary J. Risling for Objector and Appellant.

Alfred S. Wilkins for Petitioner and Respondent.

## OPINION

**DAVIS, J.**—Joseph K. appeals from a judgment declaring Crystal K. free from his parental custody and control (Civ. Code, § 232). Joseph contends that certain minimum federal standards applicable to termination of parental rights to an Indian child as set forth in the Indian Child Welfare Act of 1978 25 United States Code Section 1901 et seq.,[1] (the Act or ICWA) were not met necessitating a reversal of the judgment and a dismissal of the petition. We hold that the Act is applicable to a petition by an Indian child's non-Indian mother to terminate the parental rights of the child's Indian father. We shall reverse and remand with directions.

### FACTS

Crystal was born on December 5, 1981, in Anchorage, Alaska. In October of 1982, Crystal's mother and father, Cynthia and Joseph, separated.

---

[1] All further references to undesignated code sections are to 25 United States Code.

Cynthia and Crystal moved to Trinity County, and Cynthia obtained a dissolution of marriage on November 30, 1983. Cynthia married Jeffrey W. on May 22, 1985, and gave birth to twins on November 1, 1986.

On November 9, 1987, Cynthia filed a petition to have Crystal declared free from Joseph's parental custody and control. She alleged that Joseph had not provided any support for the minor since April of 1983, and had virtually no contact with the minor.

On December 14, 1987, counsel was appointed for Joseph. On December 28, 1987, the Native Village of Chanega (Native Village) moved to intervene alleging it is a federally recognized Indian tribe, that Crystal was a member of the tribe, and that the ICWA authorized the Indian child's tribe to intervene at any point in a state court proceeding. The court granted Native Village's motion to intervene.

Native Village moved for judgment on the pleadings on the grounds that the petition failed to state facts sufficient to constitute a cause of action in that the petition did not show compliance with minimum federal standards for termination of parental rights as required by the ICWA. The court granted the motion with leave to amend.

In her amended petition, Cynthia alleged that Joseph drank to excess, was abusive to her, and that they separated only after all remedial and rehabilitative efforts failed. She further alleged that Crystal did not know her father, had never lived with him since she was one year old, considered Jeffrey W. her father, and that the continuation of Joseph's custodial rights would likely result in serious emotional or physical injury to the minor.

At trial, the parties stipulated that the termination of the parent and child relationship would result in the minor's loss of membership in the Native Village and all benefits of such membership including higher education benefits.

Cynthia testified that Joseph did not work but rather "played" during the time they lived together in Alaska. She claimed he had a drinking problem which in part caused their separation. During the marriage, she attempted to help correct his problem as did his mother but he only got angry and would not admit he had a problem. Concerning Joseph's subsequent attempts to solve his drinking problem, Cynthia relied on Joseph's statement given to the social worker that he hoped to be working soon upon completion of an alcohol rehabilitation program.

Cynthia claimed that Joseph spoke with Crystal about three times over the telephone, wrote no letters to Crystal, and sent her support payments

only during the first year. Cynthia stated that Crystal was aware that she was part Indian. Although she claimed she was not averse to Crystal knowing more about her heritage, Cynthia did not intend forcibly to educate Crystal about her cultural ties. Cynthia knew the termination of the parent and child relationship between Joseph and Crystal meant the loss of Crystal's membership in the Native Village.

Jeffrey W. claimed Crystal considered him to be her father and he desired the termination of Joseph's parental rights. However, if termination did not occur, he intended to treat Crystal as a member of his family and as his daughter. Based on his own personal computations, he claimed he was three-eighths Cherokee. He was not a member of the Cherokee tribe, did not participate in any Indian benefits such as educational benefits, and did not know the eligibility criteria for participation in any federal programs available for Indian people. He, like his parents and grandparents, desired to make it on his own without any assistance from the government. He knew Crystal would lose eligibility for federal benefits if the parent-child relationship was severed. He offered to provide Crystal with whatever she needed.

Trinity County Mental Health clinical psychologist Donald Williams interviewed Cynthia and Crystal. He met with Crystal once for 45 minutes in a clinical setting but performed no psychological testing. He never conversed with Jeffrey in a clinical setting nor with Joseph. Dr. Williams claimed he spoke with Mr. Brody, a former member of the Hoopa Tribe, for Indian background information. Dr. Williams did not specifically know anything about Brody's background but recalled that Brody did some work in the Hoopa area and was familiar with Indian culture and heritage. While he found Crystal and Jeffrey to have bonded to one another, he did not foresee any serious emotional problem for Crystal if that relationship was never legalized. He considered Crystal already to be psychologically a part of her present family and to remove her would cause a serious emotional problem. However, maintaining the status quo would not result in any serious emotional or physical harm to Crystal.

Upon the conclusion of Cynthia's evidence, Joseph and the Native Village moved for judgment pursuant to Code of Civil Procedure section 631.8 claiming Cynthia failed to meet the substantial burdens imposed by the ICWA. The court declined to grant the motion based on its lack of certainty of the provisions of the ICWA and requested the parties to present their evidence.

Royal Earl Alsup, a clinical psychologist who specialized in ethnic and Indian psychology, opined that the termination of the parental rights and

tribal rights would result in serious psychological and emotional problems for the Indian child due to the loss of identity in terms of self-esteem and emotional needs. Although not an Indian himself, Dr. Alsup's wife is Yurok and Hoopa and their children are Indian. He also concluded that the well-being of Indian people demanded that they not be severed from their Indian culture because it has been shown that they turn against the culture in which they are raised and end up without an identity. He considered a treatment plan for an alcoholic Indian person to differ from a treatment plan for a non-Indian person in that it would have to suit the tribal culture and involve Indian value systems. He opined that the termination of the tribal rights would harm the Indian child. Dr. Alsup also believed rehabilitation efforts were required before termination of Joseph's parental rights.

The Native Village presented a Department of Interior, Bureau of Indian Affairs' (BIA) certification of the degree of Indian blood proving Joseph is four quarters Aleut.

The court in its tentative decision granted the petition, finding Joseph had abandoned the minor and that it would be detrimental for the child within the meaning of California law to not grant the petition. (Civ. Code, § 232, subd. (a)(1).) The court determined that the Act was inapplicable. The Native Village objected to the proposed statement of decision as contrary to law. The court overruled the objections and entered a decree terminating Joseph's parental custody and control.

## DISCUSSION

■ Relying on *Mississippi Choctaw Indian Band* v. *Holyfield* (1989) 490 U.S. 30 [104 L.Ed.2d 29, 109 S.Ct. 1597] and *In re Junious M.* (1983) 144 Cal.App.3d 786 [193 Cal.Rptr. 40], Joseph contends that the ICWA is applicable to the instant proceedings. Our review of the Act's various provisions leads us to conclude the same.

In adopting the ICWA, Congress made the following findings:

"(1) that clause 3, section 8, article I of the United States Constitution provides that 'The Congress shall have Power . . . To regulate Commerce . . . with Indian tribes' and through this and other constitutional authority, Congress has plenary power over Indian affairs;

"(2) that Congress, though statutes, treaties, and the general course of dealing with Indian tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources;

"(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

"(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

"(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." (§ 1901.)

Congress included in the Act its policy statement:

"The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (§ 1902.)

As succinctly noted in *In re Appeal in Pima County Juvenile Action* (1981) 130 Ariz. 202 [635 P.2d 187, 188]: "In the [ICWA], Congress declared a two-fold national policy: the protection of the best interests of Indian children, and the promotion of stable and secure Indian tribal entities. 25 U.S.C.A. § 1902."

To effectuate the purposes of the Act, "child custody proceeding[s]" (§ 1903(1)) involving the "foster care placement" (§ 1903(1)(i)), "preadoptive placement" (§ 1903(1)(iii)) or "adoptive placement" (§ 1903(1)(iv)) of an "Indian child" (§ 1903(4)), or the "termination of parental rights" (§ 1903(1)(ii)) to an Indian child are subject to specific federal procedures and standards. No one disputes that Crystal is an Indian child under the Act. The issue is whether this parental termination proceeding is subject to the Act's specific procedures and standards.

Under the Act, the child custody proceeding involving a "termination of parental rights" means "any action resulting in the termination of the

parent-child relationship." (§ 1903(1)(ii).) Two types of child custody pro-
ceedings are specifically excluded from the Act: (1) custody disputes result-
ing from divorce proceedings between parents of an Indian child; and (2)
placements of Indian children resulting from juvenile delinquency actions.
(§ 1903; *A.B.M.* v. *M.H.* (Alaska 1982) 651 P.2d 1170, 1173.)

BIA has issued guidelines for state courts in Indian child custody pro-
ceedings. (44 Fed.Reg. 67584-67595 (Nov. 26, 1979) (hereinafter Guide-
lines).) The Guidelines were "not published as regulations because they
[were] not intended to have binding legislative effect." (44 Fed.Reg. 67584.)
In its tentative decision, the trial court referred to the Guidelines as "consis-
tently interpret[ing] the Act as applying to cases where the primary issue is
whether or not an Indian child might be removed from an Indian parent or
Indian custodian." The Guidelines, however, did not interpret the Act as
excluding the present proceedings. We quote extensively from the
Guidelines:

"B.3. Determination That Placement is Covered by the Act

"(a) Although most juvenile delinquency proceedings are not covered by
the Act, the Act does apply to status offenses, such as truancy and incorrigi-
bility, which can only be committed by children, and to any juvenile delin-
quency proceeding that results in the termination of a parental relationship.

"(b) Child custody disputes arising in the context of divorce or separation
proceedings or similar domestic relations proceedings are not covered by
the Act so long as custody is awarded to one of the parents.

"(c) Voluntary placements which do not operate to prohibit the child's
parent or Indian custodian from regaining custody of the child at any time
are not covered by the Act. Where such placements are made pursuant to a
written agreement, that agreement shall state explicitly the right of the
parent or custodian to regain custody of the child upon demand." (44
Fed.Reg. 67587.)

As commentary, the Guidelines offered the following:

"The purpose of this section is to deal with some of the questions the
Department has been receiving concerning the coverage of the Act.

"The entire legislative history makes it clear that the Act is directed
primarily at attempts to place someone other than the parent or Indian
custodian in charge of raising an Indian child—whether on a permanent or
temporary basis. Although there is some overlap, juvenile delinquency

proceedings are primarily designed for other purposes. Where the child is taken out of the home for committing a crime it is usually to protect society from further offenses by the child and to punish the child in order to persuade that child and others not to commit other offenses.

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"While the Act excludes *placements* based on an act which would be a crime if committed by an adult, it does cover terminations of parental rights even where they are based on an act which would be a crime if committed by an adult. Such terminations are not intended as punishment and do not prevent the child from committing further offenses. They are based on the conclusion that someone other than the present custodian of the child should be raising the child. Congress has concluded that courts shall make such judgments only on the basis of evidence that serious physical or emotional harm to the child is likely to result unless the child is removed.

"The Act excludes from coverage an award of custody to one of the parents 'in a divorce proceeding.' If construed narrowly, this provision would leave custody awards resulting from proceedings between husband and wife for separate maintenance, but not for dissolution of the marriage bond within the coverage of the Act. Such a narrow interpretation would not be in accord with the intent of Congress. The legislative history indicates that the exemption for divorce proceedings, in part, was included in response to the views of this Department that the protections provided by this Act are not needed in proceedings between parents. In terms of the purposes of this Act, there is no reason to treat separate maintenance or similar domestic relations proceedings differently from divorce proceedings. For that reason the statutory term 'divorce proceeding' is construed to include other domestic relations proceedings between spouses." (44 Fed.Reg. 67587-67588.)

In order to exclude the proceeding from application of the Act, the trial court determined that the Civil Code section 232 action is "inextricably tied to the divorce proceeding." This view is simply incorrect and ignores the plain language of the section. A "child custody proceeding" for purposes of the Act includes "*any* action resulting in the termination of the parent-child relationship." (§ 1903(1)(ii), italics added.) The excluding language, i.e., "a *placement* based . . . upon an award, in a divorce proceeding, of custody to one of the parents" (italics added), on its face means a custody dispute involving a placement in a divorce proceeding. Congress delineated the only exclusions and judicially created exclusions cannot be added. (*In re Junious M., supra*, 144 Cal.App.3d at p. 796; *A.B.M.* v. *M.H., supra*, 651 P.2d at

p. 1173; *In re Custody of S.B.R.* (1986) 43 Wash.Ct.App. 22 [719 P.2d 154, 156].)

The trial court deemed the Act inapplicable essentially because the court believed this parental termination proceeding was a private matter between Crystal's parents analogous to a divorce proceeding. This view was grounded in the belief that the Act applies only to custody proceedings involving the removal of Indian children from their homes by nonfamily entities. In short, the view is that the Act does not apply to intrafamily custody disputes. This view of the Act's scope was squarely rejected in *A.B.M.* The *A.B.M.* court reasoned that Congress clearly excepted just two child custody proceedings from the Act—divorce proceedings and juvenile delinquency actions. Since one of these clear exceptions—divorce proceedings—involved internal family disputes, Congress was obviously aware of the issue but nevertheless chose to limit the exception. According to the court in *A.B.M.*, no compelling reasons existed to imply any other exceptions. (*A.B.M.* v. *M.H.*, *supra*, 651 P.2d at pp. 1172-1173)

True, *A.B.M.* disagreed with *In re Bertelson* (1980) 189 Mont. 524 [617 P.2d 121] in arriving at this decision. *Bertelson* involved a child custody dispute between a non-Indian mother and Indian paternal grandparents. In finding the Act inapplicable to such a situation, the *Bertelson* court reasoned: "The Act is not directed at disputes between Indian families regarding custody of Indian children; rather, its intent is to preserve Indian culture values under circumstances in which an Indian child is placed in a foster home or other protective institution." (617 P.2d at p. 125.) Furthermore, in *In re Adoption of Baby Boy L.* (1982) 231 Kan. 199 [643 P. 2d 168], the Kansas Supreme Court held the Act inapplicable to an adoption proceeding involving a non-Indian mother's illegitimate child. The *Baby Boy L.* court refused to allow the father's tribe and the paternal grandparents to intervene in the proceeding, reasoning that the "overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment. It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother." (643 P.2d at p. 175.)

However, neither *Bertelson* nor *Baby Boy L.* involved a proceeding to terminate—on abandonment grounds for the sake of stepparent adoption—the parental rights of an Indian parent to his legitimate Indian child with whom the parent had lived for nearly a year following the child's birth.

We think the purpose of the ICWA set forth in sections 1901 and 1902—to govern the removal of Indian children from their families through the application of standards that recognize the distinct Indian culture—is broad enough to encompass the parental termination proceeding before us. It can be reasonably argued that even the *Baby Boy L.* court's characterization of the Act's purpose—maintaining family and tribal relationships existing in Indian homes and setting minimum standards for the removal of Indian children from their existing Indian environment—applies to the facts before us.

The California decisions on this subject are sparse and do not provide much guidance. In *In re Junious M., supra,* 144 Cal.App.3d at page 796, the court held the Act applicable to a Civil Code section 232 proceeding filed by the county to terminate the parental rights of a mother of a child she contended was Indian. The appellate court took the trial court to task for refusing to apply the Act because the minor had developed no identification as an Indian. Citing *A.B.M.,* the court in *Junious* stated that the Act contained no such exception and it was inappropriate to create such an exception judicially. In *In re Wanomi P.* (1989) 216 Cal.App.3d 156 [264 Cal.Rptr. 623], the court deemed the Act inapplicable because the tribe at issue was not officially recognized and did not reside on a reservation and the child at issue was not an Indian child and was not a resident or a domiciliary of an Indian reservation. (216 Cal.App.3d at pp. 166-169.) *Wanomi* did not involve specifically a parental termination proceeding but rather was a child dependency case under California Welfare and Institutions Code section 300. In this milieu, the *Wanomi* court cited with approval the *Baby Boy L.* court's characterization of the ICWA as primarily concerning the maintenance of the family and tribal relationships existing in Indian homes and the establishment of minimum standards for the removal of Indian children from their existing Indian environment. (216 Cal.App.3d at p. 168.) To the extent *Wanomi* narrowly construes "Indian home" and "removal," we disagree with that court on the facts before us for the reasons that follow.

A broader view of the Act accords with the Act's characterization in *Pima, supra,* characterization approved of by the United States Supreme Court in *Holyfield. Pima* stated the purpose of the Act was to establish minimum federal standards applicable to Indian child custody proceedings to prevent the separation of Indian children from their family, tribal and cultural heritage. (635 P.2d at p. 188.) According to *Pima,* "[t]he Act is based on the fundamental assumption that it is in the Indian child's best interest that its relationship to the *tribe* be protected." (*Id.* at p. 189; italics added.) *Holyfield* stated this conclusion "seems justified," noting that "the concerns that emerged during the congressional hearings on the ICWA

were based on studies showing recurring developmental problems encountered during adolescence by Indian children raised in a white environment." (490 U.S. at p. 50 [104 L.Ed.2d at p. 47, fn. 24]; see also *In re Custody of S.B.R., supra,* 719 P.2d at p. 156.)

In his testimony, Dr. Alsup echoed these concerns. Although he did not claim to be an expert on native tribes in Alaska, Dr. Alsup had some clients from there and had extensive experience and knowledge in working with Indian children separated from their Indian culture. The severing of Indian parental and tribal ties, said Alsup, substantially harmed the emotional, security and identity needs of the Indian child involved. According to Alsup, an identity crisis often emerges in adolescence for the Indian child raised in a White culture in the absence of any Indian link. This crisis is typically exemplified in the following pattern. Powerful internal and external forces propel Indian children to seek their Indian connection. If that connection is completely severed by the Indian child's White family, the child grows to resent the family; however, the child's culture is essentially White and so connecting with the Indian way of life and thinking is also foreclosed. As one commentator has put it: "The child becomes a person without a culture: distinguishable by race from the dominant culture, but not equipped with social and cultural values that are necessary to live in the Indian culture." (*The Indian Child Welfare Act of 1978: Provisions and Policy* (1980) 25 S.D. L.Rev. 98, 114-115.)

Limiting the Act's applicability solely to situations where nonfamily entities physically remove Indian children from actual Indian dwellings deprecates the very links—parental, tribal and cultural—the Act is designed to preserve.

■ We now turn to the issue of how the specific standards set forth in section 1912(d) and (f) apply here. We begin with section 1912(d).[2] That section requires Cynthia to show that remedial and rehabilitative efforts designed to prevent the breakup of the Indian family were undertaken and that these efforts proved unsuccessful. We do not construe this provision, as did the trial court, to mean that Cynthia must show there were active efforts to provide remedial and rehabilitative services at or about the time of her separation from Joseph six years ago. Rather, Cynthia must prove that there were active efforts to provide such services subsequent to her separation from Joseph and the dissolution of their marriage. This is because the

---

[2] 25 United States Code Service, section 1912(d) provides: "Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

remedial efforts must be directed at remedying the basis for the parental termination proceeding against Joseph: his alleged abandonment of Crystal. This abandonment occurred after Cynthia and Joseph's separation and presumably continues to this day.

This view of section 1912(d) aligns with the Guidelines. According to the Guidelines, the phrase in the Act, "breakup of the Indian family" does not mean divorce but instead a situation in which an Indian parent is unable or unwilling to raise the child in a healthy manner emotionally or physically. (44 Fed.Reg. 67592, Guideline D.2, Commentary.) As concisely noted in *Pima*, section 1912(d) is simply directed at "attempt[s] to preserve the parent-child relationship." (635 P.2d at p. 193.)

Cynthia can meet this remedial and rehabilitative services requirement by proving, for example, that efforts have been made to contact the tribe to assist in maintaining the relationship between Joseph and Crystal, or that efforts have been made to enroll Joseph in child care, alcohol dependency, or similar social programs geared to native Alaskan culture or Indian culture, and that Joseph has spurned these efforts. (See *In re P.B.* (S.D.1985) 371 N.W.2d 366, 372; 44 Fed.Reg. 67592, Guideline D. 2; Trentadue & DeMontigny; *The Indian Child Welfare Act of 1978: A Practitioner's Perspective* (1986) 62 N.D. L. Rev. 487, 522, fn. 224.)

That brings us to section 1912(f), which requires Cynthia to prove that "continued custody" of Crystal by Joseph is likely to result in serious emotional or physical damage to Crystal.[3] "Custody" is not defined in the Act. But in defining "Indian custodian," the Act distinguishes legal custody from physical custody. Section 1903(6) provides: " 'Indian custodian' means any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child." The Act thus recognizes different types of custody. (*SER Juvenile Dept.* v. *England* (1982) 292 Ore. 545 [640 P.2d 608, 611-613].) And since an Indian parent is certainly afforded no less rights under the Act than an Indian custodian (cf. § 1903(6) and (9)), the use of "continued custody" in section 1912(f) must encompass more than simply actual physical custody. (See *SER Juvenile Dept.*, *supra*, at pp. 611-613.) Such an interpretation is also consistent with the Act's purpose to preserve the Indian child's link to his or her Indian

---

[3] 25 United States Code Services, section 1912(f) provides: "No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

family, tribal and cultural heritage. (*In re Appeal in Pima County Juvenile Action, supra*, 635 P.2d at p. 188.)

The trial court refused to apply section 1912(f), because Crystal had not recently been in Joseph's physical custody and had not been removed from him pursuant to a court order. This decision to limit the term "custody" under section 1912(f) to physical custody of the child was erroneous and precluded the court from determining what, if any, legal custody Joseph may have under State law or tribal law or custom. Until such a determination is made the applicability of section 1912(f) to Joseph is unclear.

Although he did not have physical custody, Joseph had some type of legal parenting relationship with Crystal. We do not have Cynthia and Joseph's dissolution decree before us, nor evidence regarding whether Joseph has any legal custody under tribal law or custom. Accordingly, we do not know the nature of Joseph's parenting rights. In California, the term "legal custody" is a wide-ranging concept encompassing a variety of parenting arrangements. (See Civ. Code, § 4600.6.) In light of our above analysis, section 1912(f) must be construed to mean whether the evidence establishes beyond a reasonable doubt that Crystal would likely experience serious emotional or physical harm if Joseph retained the legal and/or physical custody provided him under state law or tribal law or custom. (See *SER Juvenile Dept.* v. *England, supra*, 640 P.2d at p. 613; *Matter of Welfare of W. R.* (Minn.App. 1985) 379 N.W.2d 544, 549.) As with section 1912(d), the trial court's erroneous construction of the Act precluded a finding based upon section 1912(f).

We reverse and remand to the trial court to make the requisite findings under the Act (25 U.S.C. § 1912(d) and (f)) consistent with the views expressed in this opinion. Should any party desire to present additional evidence in light of our interpretation of section 1912(d) and (f), the trial court shall hold a supplemental hearing for that purpose prior to rendering its findings.

Puglia, P. J., and Carr, J., concurred.

Respondent's petition for review by the Supreme Court was denied March 14, 1991. Mosk, J., and Arabian, J., were of the opinion that the petition should be granted.