[No. E031146. Fourth Dist., Div. Two. Dec. 10, 2002.]

In re SUZANNA L., a Minor.
ROMELIA W., Petitioner and Respondent, v.
EDWARD L., Objector and Appellant;
ALAN W., Respondent.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, and IV; the footnotes; and the appendix.

**COUNSEL**

Monica Vogelmann, under appointment by the Court of Appeal, and Richard Pfeiffer for Objector and Appellant.

Christopher R. Abernathy for Petitioner and Respondent and for Respondent.

Sharon M. Jones, under appointment by the Court of Appeal, for Minor.

**OPINION**

**RICHLI, J.**—Edward L. and Romelia W. are the parents of Suzanna L. When they divorced, Romelia was given sole custody. Edward was allowed monitored visitation; however, he visited only sporadically for a year or so, and then not at all. Thereafter, Romelia married Alan W. In this action, the trial court granted Romelia's petition to terminate Edward's parental rights, based on abandonment, so Alan could adopt Suzanna.

Edward contends the trial court violated the Indian Child Welfare Act (ICWA) because he, and hence Suzanna, were part Indian, yet proper notice was not given to their tribe. We agree. In the published portion of this opinion, we will hold that the ICWA's notice provisions applied, even if, under the "existing Indian family doctrine," its other provisions did not. On

remand, the trial court must require proper notice. In the unpublished portion of this opinion, however, we find no other prejudicial error. Accordingly, if, after proper notice has been given, the trial court determines that the ICWA does not otherwise apply, it must reinstate its order terminating Edward's parental rights.

I

FAILURE TO GIVE NOTICE PURSUANT TO THE INDIAN CHILD WELFARE ACT

Edward contends the trial court erred by proceeding in the absence of proper notice pursuant to the ICWA.

A.   *Additional Factual and Procedural Background.*

On April 12, 2000, Romelia filed a petition to free Suzanna from Edward's custody and control. (Fam. Code, § 7800 et seq.) No ICWA issue was presented until June 29, 2001, when Edward's counsel stated to the court: ". . . I just found out yesterday that my client is half Indian, half Cherokee Indian." She added: "[A]ccording to the research we've done, there should be a special Indian social worker appointed in the case." The trial court ordered Edward's counsel to file a written request for any action she wanted taken.

On July 9, 2001, Edward filed an "Objection to the [A]doption [o]f the [M]inor [B]ased on [H]is Indian Ancestry." In it, he asserted that he was "50% Indian as both of his [maternal] grandparents are full[-]blooded Indians . . . ." He added that he was "maybe 50% Cherokee or Ya[qu]i Indian." He provided copies of his mother's and his mother's sister's birth certificates, which indicated that one or both of their parents (Edward's grandparents) were Indian. He asked the court to "allow sufficient time for the Bureau of Indian Affairs to investigate the matter."

On July 10, 2001, the department of children's services (the Department) advised the trial court that it was going to "send the appropriate requests to the tribes." It added that the "tribes in question" were the "Papago (four separate bands), Cherokee (three separate bands), and Yaqui (possibly one band)." It requested a continuance.

On July 13, 2001, the trial court stated: "[S]hould the child fall under the provisions, the tribe could or could not choose to intervene. [¶] [The Department is] recommending a continuance because they're going to contact the [tribes]. And they're going to request of the tribes to see what

they're going to do. [¶] So I think that we're going to have to put it over." Counsel for the W.'s replied, "I concur . . . . Continue it, let Social Services do their thing, and . . . if the tribe wants to come here and assert their rights . . . , then the [c]ourt can decide how to act at that point." Edward's counsel said, "I completely concur." The trial court set a status conference for October 19, 2001.

On October 18, 2001, the Department reported: "We are in the process of obtaining information on the Indian ancestry of the minor . . . . Our results as of this date are as follows:

"Cherokee tribe: Tahlequah, OK - Not on rol[l]

"Cherokee tribe: North Carolina - Not on rol[l]

"Papagos and Yaquis: No response." (Capitalization omitted.)

The court continued the matter to January 25, 2002.

On January 25, 2002, Edward's counsel said: "We've talked to the social worker and she had indicated she was going to be sending a request to the [c]ourt for another extension because the Yaquis had not responded, neither have the Papago . . . ." The court denied a further continuance. It ordered the matter trailed to January 28, 2002.

On January 28, 2002, Edward's counsel stated: ". . . I have an objection to this case even being ready for trial because we never got back information from the Indian tribes . . . ." The trial court ordered her to brief the issue. It set the trial for January 30, 2002.

Edward filed a brief asserting that he was a Papago Indian. He did not clearly indicate what he believed the effect of this should be. He did argue that "the [f]ederal law has exclusive jurisdiction over this matter . . . ." He also argued that "since the [s]tate law does not prescribe what constitutes a member of a tribe the federal government would have exclusive jurisdiction over the issue of Indian ancestry." The W.'s responded with a brief claiming that, back on July 13, 2001, when it had granted a continuance, the trial court had "denied the jurisdictional objection and ruled that the tribes could participate at their election."

When trial began, on January 30, 2002, the court said to Edward's counsel: "You raised the issue but you haven't asked me for any relief. What's your request?" Edward's counsel asked the court to "dismiss this

case based on the federal jurisdiction of the federal court over the matter . . . ." Minor's counsel objected, "[O]nce they've been put on notice, . . . it is up to the tribe . . . if they want to assert that. If they don't, we proceed . . . ." The trial court then ruled: "[T]here's a fairly common, well-known procedure for invoking the jurisdiction of the Indian tribes and for obtaining a stay o[f] the proceedings so they can invoke their jurisdiction. You haven't done that. Your motion is denied."

B.  *Analysis.*

1.  *Statutory Background.*

"The ICWA (25 U.S.C. § 1901 et seq.) was enacted in 1978, out of an increasing concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of child welfare practices that separated large numbers of Indian children from their families and tribes, and placed them in non-Indian homes through state adoption, foster care, and parental rights termination proceedings. [Citations.] . . .

"The stated purpose of the ICWA is to 'protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster care or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.' [Citation.]" (*In re Santos Y.* (2001) 92 Cal.App.4th 1274, 1299 [112 Cal.Rptr.2d 692], fn. omitted.)

The ICWA defines a "child custody proceeding" so as to include any proceeding for either " 'termination of parental rights[,]' which shall mean any action resulting in the termination of the parent-child relationship" or " 'adoptive placement[,]' which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption." (25 U.S.C. § 1903(1)(ii), (iv).) Thus, a proceeding to terminate parental rights under Family Code section 7800 et seq. is a "child custody proceeding" within the meaning of the ICWA. (*In re Crystal K.* (1990) 226 Cal.App.3d 655, 660-666 [276 Cal.Rptr. 619].) The ICWA defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe . . . ." (25 U.S.C. § 1903(4).)

The ICWA also "lays out a dual jurisdictional scheme. Section 1911(a) establishes exclusive jurisdiction in the tribal courts for proceedings concerning an Indian child 'who resides or is domiciled within the reservation of

such tribe[]' . . . . Section 1911(b), on the other hand, creates concurrent but presumptively tribal jurisdiction in the case of children not domiciled on the reservation: on petition of either parent or the tribe, state-court proceedings for . . . termination of parental rights are to be transferred to the tribal court, except in cases of 'good cause,' objection by either parent, or declination of jurisdiction by the tribal court." (*Mississippi Choctaw Indian Band v. Holyfield* (1989) 490 U.S. 30, 36 [109 S.Ct. 1597, 1601-1602, 104 L.Ed.2d 29], fn. omitted.) Moreover, if a proceeding for termination of parental rights is pending in state court, "the Indian child's tribe shall have a right to intervene at any point in the proceeding." (25 U.S.C. § 1911(c).)

The ICWA provision most critical in this case—the notice provision—states: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the . . . termination of parental rights to[] an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of . . . the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to . . . the tribe. No . . . termination of parental rights proceeding shall be held until at least ten days after receipt of notice by . . . the tribe or the Secretary: *Provided*, [t]hat . . . the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding." (25 U.S.C. § 1912(a); see also 25 U.S.C. § 1903(11).) If parental rights are terminated without such notice, then either the child, the parent from whose custody the child was removed, or the tribe can petition to invalidate the termination. (25 U.S.C. § 1914.)

When the ICWA applies, an indigent parent has the right to appointed counsel. (25 U.S.C. § 1912(b).) Moreover, "[n]o termination of parental rights may be ordered . . . in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912(f).)

2. *Analysis.*

■ We begin by correcting several of the parties' mistaken notions regarding the ICWA. The ICWA does not give either the federal courts or the tribal courts "exclusive jurisdiction" in this kind of case. It may require that such a state court proceeding be transferred to a tribal court, but not that

it be dismissed. It does not require a trial court to continue a case indefinitely while awaiting a response from a tribe. And it never requires a "special Indian social worker."

■ The W.'s argue notice was not required because there was insufficient evidence that Suzanna was an "Indian child" within the meaning of the ICWA. An "Indian child" is defined as "either (a) a member of an Indian tribe or (b) . . . eligible for membership in an Indian tribe and . . . the biological child of a member of an Indian tribe . . . ." (25 U.S.C. § 1903(4).) Notice, however, is required whenever "the court knows *or has reason to know* that an Indian child is involved . . . ." (25 U.S.C. § 1912(a), italics added.)

■ "The determination of whether a minor is, or is not, an Indian child is made exclusively by the tribe. [Citation.] '[O]ne of the primary purposes of giving notice to the tribe is to enable the tribe to determine whether the child involved in the proceedings is an Indian child. [Citation.]' [Citation.] 'Because the question of membership rests with each Indian tribe, when the juvenile court knows or has reason to believe the child may be an Indian child, notice must be given to the particular tribe in question or the Secretary [of the Interior].' [Citation.] Thus, the Indian status of a child need not be certain or conclusive in order to trigger the Act's notice requirements. [Citation.]" (*In re Jonathan D.* (2001) 92 Cal.App.4th 105, 110 [111 Cal.Rptr.2d 628], quoting *In re Desiree F.* (2000) 83 Cal.App.4th 460, 470-471 [99 Cal.Rptr.2d 688].)

■ Here, the evidence did not show that Suzanna was, in fact, an Indian child; i.e., it did not show that she was a member of, or eligible for membership in, an Indian tribe or that Edward was a member of an Indian tribe. However, it did show that Edward's maternal grandparents were Indian. Such evidence of Indian ancestry is sufficient "reason to know" a child is an Indian child so as to trigger the notice requirement. (*In re Samuel P.* (2002) 99 Cal.App.4th 1259, 1266-1267 [121 Cal.Rptr.2d 820]; *In re Jonathan D., supra*, 92 Cal.App.4th at p. 111; *In re Desiree F., supra*, 83 Cal.App.4th at pp. 470-471.)

The trial court erred by finding that Edward had somehow been dilatory. The W.'s do not even argue otherwise. ■ " 'Notice is mandatory, regardless of how late in the proceedings a child's possible Indian heritage is uncovered. [Citations.]' [Citation.]" (*In re Jonathan D., supra*, 92 Cal.App.4th at p. 111, quoting *In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1424 [285 Cal.Rptr. 507].) "The notice requirements serve the interests of the Indian tribes 'irrespective of the position of the parents' and cannot be

waived by the parent. [Citation.]" (*In re Samuel P., supra*, 99 Cal.App.4th at p. 1267, quoting *In re Kahlen W., supra*, 233 Cal.App.3d at p. 1421.) Thus, "where the notice requirements of the Act were violated and the parents did not raise that claim in a timely fashion, the waiver doctrine cannot be invoked to bar consideration of the notice error on appeal." (*In re Marinna J.* (2001) 90 Cal.App.4th 731, 739 [109 Cal.Rptr.2d 267].)

■ The W.'s do argue that the Department gave adequate notice. Technically, it was not the Department's job to give notice; the W.'s, as "the part[ies] seeking the . . . termination of parental rights to[] an Indian child," should have given notice. (25 U.S.C. § 1912(a).) Still, if the Department gave adequate notice, presumably this error would be harmless. It is far from clear, however, that the Department contacted the appropriate tribe(s). Given the uncertainty as to the tribe with which Edward's grandparents were affiliated, notice should have been given to the Bureau of Indian Affairs (the BIA), on behalf of the Secretary of the Interior. (25 U.S.C. § 1912(a); 25 C.F.R. § 23.11(c)(12) (2002); *In re Edward H.* (2002) 100 Cal.App.4th 1, 4-6 [122 Cal.Rptr.2d 242].)

Moreover, the trial court was not provided with copies of the notices the Department sent or the return receipts (if any) it received. Thus, there is *insufficient evidence that two of the tribes—the tribes that failed to respond—received actual notice.* (*In re Samuel P., supra*, 99 Cal.App.4th at p. 1266.) There is likewise insufficient evidence that the Department properly notified the tribes, not only of the proceeding, but also of their right to intervene. (*Ibid.*) "[S]peaking with various members of the tribe in an attempt to determine the minor's status does not satisfy the notice requirement. [Citations.]" (*In re Desiree F., supra*, 83 Cal.App.4th at p. 475.)

Although two tribes did respond, their actual responses are also not in the record. The Department summarized the responses as, "Not on rol[l]." It is not clear whether this referred to Suzanna, Edward, or Edward's grandparents. ■ In any event, "[e]nrollment is not required in order to be considered a member of a tribe; many tribes do not have written rolls. [Citation.] While enrollment can be one means of establishing membership, it is not the only means, nor is it determinative. [Citation.]" (*In re Desiree F., supra*, 83 Cal.App.4th at pp. 470-471.) ■ Moreover, the ultimate question was whether Suzanna was either a member or *eligible* for membership in a tribe. Thus, we cannot say that giving proper notice would have been fruitless.*

■ Finally, the W.'s argue that notice was not required because Suzanna was not being removed from an existing Indian family; thus, the

---

*See footnote, *ante*, page 223.

underlying purposes of the ICWA were not implicated. They did not raise this contention below. "The issue is properly before this court, however, because the facts are undisputed and the issue merely raises a new question of law. [Citation.]" (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 642, fn. 7 [59 Cal.Rptr.2d 671, 927 P.2d 1175].)

■ Under the so-called existing Indian family doctrine, the ICWA is not applied "where its purpose, [preventing] the improper removal of Indian children from their Indian families, would not be served." (*In re Santos Y.*, *supra*, 92 Cal.App.4th at p. 1304.) This doctrine had its genesis in *Matter of Adoption of Baby Boy L.* (1982) 231 Kan. 199 [643 P.2d 168], which involved the child of an Indian father and a non-Indian mother. (*Id.* at p. 201 [643 P.2d at p. 172].) As in this case, a proceeding was brought to terminate the father's parental rights so the child could be adopted. (*Id.* at pp. 201-202 [643 P.2d at pp. 172-173].) Notice was given to the father's tribe. (*Id.* at p. 202 [643 P.2d at p. 173].) The trial court, however, denied the tribe's petition to intervene and refused to transfer the case to the tribal court; it ruled that the ICWA did not apply (*Baby Boy L., supra,* at p. 203 [643 P.2d at pp. 173-174]), in part because "the child has never been a part of any Indian family relationship." (*Id.* at p. 205 [643 P.2d at p. 174].) It then proceeded to terminate the father's parental rights. (*Id.* at p. 203 [643 P.2d at pp. 173-174].)

The appellate court agreed that the ICWA did not apply. It based its opinion on legislative intent: "A careful study of the legislative history behind the Act and the Act itself discloses that the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment. It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother." (*Matter of Adoption of Baby Boy L., supra,* 231 Kan. at pp. 205-206 [643 P.2d at p. 175].)

Some California courts which have accepted the existing Indian family doctrine derive it, as *Baby Boy L.* did, from legislative intent. (*Crystal R. v. Superior Court* (1997) 59 Cal.App.4th 703, 718-723 [69 Cal.Rptr.2d 414] [Sixth Dist.]; *In re Wanomi P.* (1989) 216 Cal.App.3d 156, 168 [264 Cal.Rptr. 623] [Second Dist., Div. One], cert. den. *sub nom. Mic Mac Nation v. Giesler* (1990) 498 U.S. 816 [111 S.Ct. 57, 112 L.Ed.2d 33].) Others have

rejected the doctrine as an unwarranted judicial gloss on the ICWA. (*In re Alicia S.* (1998) 65 Cal.App.4th 79, 83-92 [76 Cal.Rptr.2d 121] [Fifth Dist.]; *In re Junious M.* (1983) 144 Cal.App.3d 786, 796 [193 Cal.Rptr. 40] [First Dist., Div. Three]; see also *Adoption of Lindsay C.* (1991) 229 Cal.App.3d 404, 409-416 [280 Cal.Rptr. 194] [First Dist., Div. Three].)

Recent California decisions, however, have reformulated the existing Indian family doctrine as a federal constitutional limitation on the ICWA. (*In re Santos Y.*, *supra*, 92 Cal.App.4th at pp. 1306-1323 [Second Dist., Div. Two]; *In re Bridget R.* (1996) 41 Cal.App.4th 1483, 1501-1512 [49 Cal.Rptr.2d 507] [Second Dist., Div. Three], cert. den. *sub nom. Cindy R. v. James R.* (1997) 519 U.S. 1060 [117 S.Ct. 693, 136 L.Ed.2d 616]; see also *In re Alexandria Y.* (1996) 45 Cal.App.4th 1483, 1492-1493 [53 Cal.Rptr.2d 679] [Fourth Dist., Div. Three].) They reason that, if the ICWA applied to a child who does not have an existing Indian family, it would be unconstitutional in three different respects. First, it would violate substantive due process, because it would deprive the child of the fundamental right to a stable and existing relationship with his or her de facto family without serving the governmental purposes behind the ICWA. (*In re Santos Y.*, *supra*, at pp. 1306-1307, 1314-1317; *In re Bridget R.*, *supra*, at pp. 1502-1508.) Second, it would violate equal protection, because it would treat Indian children differently based solely on race, rather than on the child's social, cultural, or political affiliation with a tribe. (*In re Santos Y.*, *supra*, at pp. 1307-1308, 1317-1322; *In re Bridget R.*, *supra*, at pp. 1508-1510.) Third, it would violate the Tenth Amendment, because jurisdiction over family relationships is traditionally reserved to the states, and because there is no substantial nexus between the Congress's power under the Indian commerce clause, on the one hand, and custody proceedings involving children with no significant relationship to Indian culture, on the other. (*In re Santos Y.*, *supra*, at pp. 1308-1309, 1322-1323; *In re Bridget R.*, *supra*, at pp. 1510-1511.)

On the facts before us, however, we need not decide whether to accept the existing Indian family doctrine—much less whether to accept it as a matter of legislative intent or constitutional imperative. We may assume, without deciding, that it is established law on one rationale or the other. We may further assume, without deciding, that the record before us conclusively establishes that Suzanna has no existing Indian family. Even if so, the trial court was required to give notice.

This is true under the legislative intent version of the existing Indian family doctrine. A court in Kansas, where the existing Indian family doctrine

originated, has so held. In *In the Interest of H.D.* (1986) 11 Kan.App.2d 531 [729 P.2d 1234], the mother was part Cherokee. The trial court terminated parental rights without giving notice to her tribe. However, it was unclear whether the ICWA applied, because she did not become a member of the tribe until six weeks after the termination. (*In the Interest of H.D., supra,* at p. 532 [729 P.2d at p. 1236].)

The appellate court held: "Although we do not decide the question of the applicability of the Act, we agree that the court's failure to direct that proper notice be served upon the tribe or Secretary of the Interior renders the termination order invalid." (*In the Interest of H.D., supra,* 11 Kan.App.2d at p. 532 [729 P.2d at p. 1236].) It found that there were "reasonable grounds" to believe that the children were "Indian child[ren]." (*Id.* at p. 536 [729 P.2d at p. 1239].) It distinguished *Baby Boy L.* as follows: "Unlike the case of *In re Adoption of Baby Boy L.* . . . , we are not concerned with a determination of whether the Act applies. In this decision, we are concerned with the tribe's right to notification of involuntary proceedings where the court has reasonable grounds to believe a child subject to the proceeding is or may be an Indian child. [Citation.]" (*In the Interest of H.D., supra,* at p. 534 [729 P.2d at p. 1237].) The court noted that in *Baby Boy L.* notice had been given to the tribe; "[i]n this case, however, the Cherokee Tribe was never notified of the pendency of state court proceedings. Consequently, the tribe was denied the opportunity to be heard on the issue of whether the Act applied to the state court proceedings." (*In the Interest of H.D., supra,* at p. 534 [729 P.2d at p. 1237].)

The same result follows under the federal constitutional version of the existing Indian family doctrine. The cases which have held the application of the ICWA to be unconstitutional did not involve the notice provisions of the ICWA. Rather, they involved provisions of the ICWA which deprived the child directly and immediately of his or her fundamental right to an established family relationship. For example, in *In re Santos Y., supra,* 92 Cal.App.4th 1274, a juvenile dependency proceeding, a boy had been placed with prospective adoptive parents when he was three months old. (*Id.* at pp. 1279, 1283.) Notice was given to his mother's tribe (*id.* at pp. 1280, 1282), and eventually the tribe intervened. (*Id.* at pp. 1288-1289.) When the boy was two and a half years old, the trial court, applying the placement preference of the ICWA (25 U.S.C. § 1915(a)), ordered the boy removed from his prospective adoptive parents and placed with a member of the tribe. (*Santos Y., supra,* at pp. 1281, 1298.) The appellate court held this "*application* of the ICWA . . . unconstitutional . . . ." (*Id.* at p. 1282, italics added; see also *id.* at p. 1312.)

Similarly, in *In re Bridget R.*, *supra*, 41 Cal.App.4th 1483, the biological parents had voluntarily relinquished their parental rights, and their twin daughters had been placed with a prospective adoptive family since birth. Two years later, the trial court ruled that the voluntary relinquishment did not comply with the voluntary termination standards of the ICWA (25 U.S.C. § 1913(a)); it therefore ordered the girls removed from their adoptive family and placed with their biological father. (*Bridget R., supra,* at pp. 1490-1491, 1493-1495.) Thus, once again, this particular application of the ICWA interfered directly with the girls' fundamental right to an established family relationship.

Applying the notice requirements of the ICWA, even to a child who has no existing Indian family, does no such thing. It does not take the child out of his or her existing placement. All it does is prevent the termination of parental rights for perhaps 25 days. The tribe may respond that the child is not an Indian child. Alternatively, the tribe may not respond at all; in that case, it will be barred from subsequently invalidating the termination of parental rights based on lack of notice.

Admittedly, if the tribe responds that the child *is* an Indian child, the trial court may have to decide whether to apply other provisions of the ICWA, such as the placement preference, which *would* threaten the child's existing family relationship. That, however, would be the perfect time to invoke the existing Indian family doctrine. Here, for example, the record before us strongly suggests that Suzanna has no existing Indian family. She was born in 1990. She has lived with her non-Indian mother, Romelia, all her life, and with Romelia's non-Indian husband, Alan, since 1993. The W.'s have four other non-Indian children, Suzanna's half siblings, to whom she is bonded. The trial court found that Edward had "had only sporadic and infrequent contacts with Suzanna"; he has not challenged this finding. His last visit with her was in 1992. Moreover, even though Edward is genetically half Indian, he is so lacking in any Indian cultural affiliation that he is not even sure what tribe he comes from. Thus, if a tribe does claim Suzanna is an Indian child, as long as the trial court follows the "existing Indian family doctrine," it seems most likely that her placement will not change.

Giving notice, however, at least permits the tribe to be heard on the question of whether the child does have an existing Indian family. The tribe's interests are not necessarily congruent with the parents'. Thus, the tribe may have an interest in proving that the child has an existing Indian family, even when the parents do not. Under those circumstances, compliance with the notice provisions of the ICWA, even though the child does not

*appear* to have an existing Indian family, does promote the federal policies underlying the ICWA.

Because the notice provisions of the ICWA promote a substantial governmental interest without impinging upon a child's existing family relationships, they do not violate due process. Moreover, because the notice provisions assist in determining whether the child has a social, cultural, or political affiliation with a tribe, they do not violate equal protection. Finally, there is a substantial nexus between the notice provisions and Congress's constitutional power over Indian affairs. Accordingly, they do not violate the Tenth Amendment.

We conclude that the trial court erred by terminating Edward's parental rights, since there had not been substantial compliance with the notice requirements of the ICWA. But this does not mean the trial court must go back to square one. It simply means the trial court must see to it that proper notice is given. If, after giving proper notice, it finds insufficient evidence that Suzanna is, in fact, an Indian child, it must reinstate its order terminating Edward's parental rights. (See *In re IEM* (1999) 233 Mich.App. 438, 449-450 [592 N.W.2d 751, 757-758], and cases cited.)

## II-IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V

### DISPOSITION

The order terminating Edward's parental rights is reversed. On remand, the trial court must require the W.'s to give notice to the BIA, in accordance with the ICWA and its implementing regulations. (25 U.S.C. § 1912(a); 25 C.F.R. § 23.11 (2002).) If there is no timely response, or if the response raises no substantial question as to whether Suzanna is an Indian child, the trial court must reinstate its original order. If, however, the response does raise a substantial question as to whether Suzanna is an Indian child, the trial court must hold further proceedings consistent with the ICWA. Even then, if it determines, in the course of such proceedings, that the ICWA does not otherwise apply, it must reinstate its original order.

---

*See footnote, *ante*, page 223.

Costs on appeal are not awardable in this proceeding. (Cal. Rules of Court, rules 26(a)(1), 39(a).)

McKinster, Acting P. J., and Gaut J., concurred.

APPENDIX*

*See footnote, *ante*, page 223.