Filed 3/6/13  In re Ryan R. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re RYAN R., a Person Coming Under the Juvenile Court Law. | B242620 |
| | (Los Angeles County Super. Ct. No. CK93461) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| BRITTANY T., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Marilyn Kading Martinez, Commissioner.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and David Nakhjavani, Deputy County Counsel for Plaintiff and Respondent.

Brittany T. (mother) appeals from the juvenile court's orders terminating jurisdiction over her son Ryan (born November 2009) and placing him in the custody of his father, Jonathan R. (father),[1] pursuant to Welfare & Institutions Code section 361.2.[2] We affirm.

## CONTENTIONS

Mother contends that the juvenile court failed to comply with the notice requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq. (ICWA).) Mother further contends that the juvenile court erred when it terminated jurisdiction and granted sole legal and physical custody to father.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.  Section 300 petition and detention

The Los Angeles County Department of Children and Family Services (DCFS) received a referral of domestic violence on April 17, 2012, involving mother and her husband, Martin G. (Martin).  An investigating police officer observed mother's face was swollen and there were scratches on her arm.  Mother told the investigating officer that Martin had become upset and started hitting her.  Ryan witnessed the incident, so the officers requested a follow-up home visit to assess Ryan's safety.

On April 23, 2012, a DCFS children's social worker arrived at the home and spoke with mother.  Mother stated that she and Martin had been married for only two months.  Mother confirmed the incident of domestic violence.  She stated that she would be seeking an annulment of the marriage, that Martin was incarcerated, and that she had obtained an emergency restraining order against him.  Mother also indicated that she planned to relocate.

Mother identified father as Ryan's biological father, but stated that father was not in contact with Ryan and that mother was unaware of his whereabouts.

---

[1]    Father is not a party to this appeal.

[2]    All further statutory references are to the Welfare & Institutions Code unless otherwise noted.

On May 2, 2012, DCFS received another referral regarding Ryan. The referral alleged that since Martin's incarceration, mother had invited several men and women to live with her and Ryan and that the men and women were up all night, doing drugs. They slept during the day, and it was unclear who was supervising Ryan.

A DCFS social worker went to the home on the day of the referral. A woman answered the door, and informed the social worker that she did not live in the home but she was doing mother a favor and babysitting Ryan while mother was out. Ryan appeared well groomed and healthy. The social worker returned to the home on May 4, 2012, and spoke with mother. Mother, who was on probation for petty theft, denied that people were coming in and out of the home. She told the social worker that she had submitted to a drug test on May 2, 2012, and that she was serving 90 days of house arrest.

When asked about father, mother stated that she had not been in contact with him for some time. She told the social worker that father did not know how to care for Ryan and described an incident where father returned Ryan to her with wet pants because father did not have any diapers for him. Ryan was again observed to be healthy and free of marks or bruises. The home appeared suitable for a child.

On May 7, 2012, mother's drug test came back positive for methamphetamine. Mother's probation officer noted that this was a violation of mother's probation, and she would have to spend the remainder of her sentence in jail, leaving Ryan without a caretaker.

When the social worker attempted to take Ryan into custody, mother did not answer the door. The social worker was able to reach mother by telephone. Mother said she was visiting her probation officer in Santa Ana. However, mother's probation officer tracked mother's location, using her ankle bracelet, to her home. The probation officer reported that mother would be taken into custody that day.

When speaking with the social worker, mother initially denied drug use and stated that she did not know why her drug test came back positive for methamphetamine. She later admitted methamphetamine use, but denied an addiction.

Ryan was taken into protective custody and placed with maternal aunt, Megan T.

3

On May 11, 2012, DCFS filed a section 300 petition on behalf of Ryan based on mother's drug use and the incident of domestic violence with Martin. At the detention hearing, the juvenile court found a prima facie case for detaining Ryan pursuant to section 300, subdivision (b). Because mother was incarcerated and could not attend the hearing, the juvenile court continued the case, deferring any findings on ICWA and paternity.

**2. Jurisdiction/disposition**

DCFS filed a jurisdiction/disposition report on June 8, 2012. Mother had been released from custody and returned home on June 6, 2012. On that date, DCFS conducted a face to face interview with mother. DCFS noted that on May 8, 2012, mother had stated that her family may have Cherokee heritage but she was unable to identify any specific nation or band.

DCFS followed up on this information in its June 6, 2012 interview with mother. Mother was asked to provide information about her possible Cherokee heritage. Mother stated that her paternal grandfather may have had this heritage. However, she did not know from which band this heritage may have come, nor if he was registered or enrolled with any of the tribes. Her grandfather was born at an unknown location in Missouri and passed away on May 24, 2011. Mother stated that neither her father's mother, nor her mother, had any known Native American heritage. Mother's father was also deceased, so no one on mother's paternal side could be reached for further questioning on the issue.

Father was interviewed on June 4, 2012, and denied any Native American heritage.

Regarding the allegations, father did not know much about Martin. Mother had stopped all contact with father after she married Martin in February 2012. On one occasion, father and his girlfriend encountered mother and Martin on the street while father was caring for Ryan. Mother became upset and Martin started becoming violent, shouting his gang affiliation, posturing and threatening father with physical harm. Father concluded that Martin was a violent individual. Father heard from third parties that mother and Martin argued frequently, but did not have any further information.

4

Father had never seen mother use drugs but he knew she smoked methamphetamine. He acknowledged that he smoked marijuana and had a valid medical marijuana card.

Mother confirmed that father did not drink or use any illicit controlled substances and that father had a valid medical marijuana card. Mother assured the social worker that she had never seen father under the influence of marijuana during visits with Ryan.

DCFS reported that father was proactive in the case and appeared to be aware of the family's needs. Father committed himself to strengthening his bond with Ryan and allowed his medical marijuana card to expire in an effort to make himself better able to care for Ryan. Father had a minimal criminal history which consisted of a single arrest when he was 16 years old. Father was gainfully employed and seemed capable of caring for Ryan. DCFS recommended that the juvenile court grant it discretion to release Ryan to father upon completion of a home assessment report.

Mother and father were both present for the June 8, 2012 adjudication hearing. Father was found to be Ryan's presumed father. Mother entered a no contest plea to the allegations. The juvenile court sustained the allegations regarding domestic violence and substance abuse against mother pursuant to section 300, subdivision (b).

The juvenile court found that ICWA did not apply to the case.

Regarding disposition, the court set the matter for a contested hearing on June 22, 2012.

At the June 22, 2012 disposition hearing, mother's counsel informed the court that mother did not want Ryan placed with father because she considered father to be immature. Father asked that Ryan be released to his custody. Ryan's counsel joined father's request, but asked that the court retain jurisdiction.

The juvenile court declared Ryan to be a dependent of the court, finding by clear and convincing evidence that his safety could not be ensured without removal from mother's custody. The court then ordered Ryan to be placed in father's custody, and, pursuant to section 361.2, terminated jurisdiction. The court found no need for continued supervision.

The juvenile court explained its decision. The court found no risk factors for the child in his father's custody. The court stated that father was nonoffending and had participated in regular visits since the case came before the court. The visitation went very well; Ryan knew who his father was and enjoyed being with him. The court "[had] to make a decision as to whether or not his aunt or his father is a more appropriate caretaker. A parent has a fundamental right to parent his child over and above anyone else other than the other parent, of course."

DCFS was opposed to Ryan being placed with father because father lived on a property with two dwellings and the individuals in the back home declined to have criminal checks. The court observed "this is akin to many people living in an apartment building . . . and I find that it is not reasonable to believe that people that live in a back house or a close dwelling have to be approved by the department before a child can be placed with a parent such as [father]."

The court explained to mother that it had not terminated her parental rights. "You can file for a modification with our Superior Court in Los Angeles in the Family Law Division. You will simply have to persuade the court that you have made substantial progress addressing the issues which you need to address."

On June 22, 2012, mother filed her notice of appeal.

## DISCUSSION

### I. The juvenile court did not err in finding ICWA inapplicable

The ICWA is federal legislation designed to protect Indian people and their culture from extinction. (25 U.S.C. § 1902; *In re Crystal K.* (1990) 226 Cal.App.3d 655, 661.) ICWA applies to all proceedings involving Indian children that may result in an involuntary foster care placement; guardianship or conservatorship placement; custody placement under Family Code section 3041; declaration freeing the child from the custody and control of one or both parents; termination of parental rights; or adoptive placement. (Cal. Rules of Court, rule 5.480.)

6

An "Indian child" is defined as any unmarried person under the age of 18 who is (1) a member of an Indian tribe; or (2) eligible for membership in an Indian tribe and the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); § 224, subd. (c).)

If the court, social worker, or probation officer knows or has reason to know that an Indian child is involved in a dependency proceeding, the social worker or probation officer is required to make further inquiry regarding the possible Indian status of the child as soon as practicable. The social worker or probation officer must interview the parents and extended family members to gather the information required, then contact the Bureau of Indian Affairs (BIA) and State Department of Social Services for assistance in identifying the tribes of which the child may be a member or eligible for membership. (§ 224.3, subd. (c).)

Mother argues that DCFS failed to make contact with the BIA or any of the Cherokee tribes in the United States as it was required to do in response to mother's information regarding Ryan's Indian ancestry. Mother argues that both DCFS and the juvenile court had an affirmative duty to inquire as to whether Ryan might be an "Indian child" within the meaning of the statutory scheme. Mother argues that once the inquiry resulted in notice that there was an Indian child involved, DCFS was required to obtain all of Ryan's family history, including the name of the tribes in which Ryan is enrolled or eligible for enrollment. (§ 224.2, subd. (a)(5).)

Here, the trial court reviewed both parents' ICWA forms and found "there's no reason to know that the Indian Child Welfare Act applies." This finding is reviewed under the substantial evidence standard. (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430; *In re Karla C.* (2003) 113 Cal.App.4th 166, 178-179.) Thus, we must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we must indulge all legitimate inferences in favor of affirmance. (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212.) A juvenile court's ICWA finding is also subject to harmless error analysis. (*In re Alexis H.* (2005) 132 Cal.App.4th 11, 16.)

In this case, there was insufficient evidence for the court to have any reason to believe that Ryan was an Indian child. The California Rules of Court provide the

7

circumstances under which a court has "reason to know" that the child is an Indian child. Those circumstances include:

> "(A)  The child or a person having an interest in the child, including an Indian tribe, an Indian organization, an officer of the court, a public or private agency, or a member of the child's extended family, informs or otherwise provides information suggesting that the child is an Indian child to the court . . . ;

> "(B)  The residence or domicile of the child, the child's parents, or an Indian custodian is or was in a predominantly Indian community; or

> "(C)  The child or the child's family has received services or benefits from a tribe or services that are available to Indians from tribes or the federal government . . . ."

(Cal. Rules Court, rule 5.481(a)(5).)

None of these circumstances were present here.  Mother informed DCFS that her family may have Cherokee ancestry through her paternal grandfather, who was deceased. Mother did not know what tribe or band her grandfather may have belonged to, where her grandfather was born, or whether he was ever a registered member of any tribe or band. Her own father was also deceased, and there was no other way of obtaining any such information.  Mother's speculation that the child's great-grandfather may have had Cherokee heritage does not suggest that Ryan could be described as an Indian child under the applicable law.  As set forth above, an Indian child must either be a member of an Indian tribe or eligible for membership and the biological child of a member of an Indian tribe.  (§ 224, subd. (c).)

Courts have recognized that the requirements of ICWA are not triggered when the possibility that a child has Indian ancestry is based on vague information.  For example, in *In re O.K.* (2003) 106 Cal.App.4th 152, ICWA notice was sent to the BIA based on the mother's statement that she "'may be of Native American [h]eritage.'"  (*Id.* at p. 154.) The notice was returned because it contained "'[i]nsufficient identifying tribal information.'"  (*Ibid.*)  At the section 366.26 hearing, the paternal grandmother further

informed the court, "'the young man may have Indian in him. I don't know my family history that much, but where were [*sic*] from it is that section so I don't know about checking that.'" (*Id.* at p. 155.) Under these circumstances, the trial court's finding that there was no reason to believe the child was Indian was affirmed on appeal.

Similarly, in *In re Z.N.* (2009) 181 Cal.App.4th 282, mother had stated her belief that one of her grandmothers was Cherokee and another part Apache. The tribes were unidentified. Mother reported that she was not registered and did not believe her mother established any tribal affiliation. In affirming the trial court's determination that tribal notice was not necessary, the court stated:

> "Whatever the status of the grandmothers, they were great-grandmothers of the twins, and this information did not suggest that the twins were members or eligible for membership as children of a member. We agree . . . that this did not trigger a duty to notify tribes. Thus there was no error."

(*In re Z.N., supra*, at p. 298.)

The facts of *Z.N.* are analogous to the matter before us. Mother believed that the child's great-grandparent was part Cherokee, but had no specific tribal information. As in *Z.N.*, this did not trigger a duty to notify any tribes. (See also *In re J.D.* (2010) 189 Cal.App.4th 118, 125 [paternal grandmother's belief that she had Native American ancestry was "too vague, attenuated and speculative to give the court any reason to believe the children might be Indian children"].) We find that the juvenile court's finding is supported by the record, and no error occurred.

Even if error had occurred, any such error would be harmless under the circumstances of this case. The California Constitution provides that a judgment may not be set aside unless it has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) Thus, reversal is permitted only if it is reasonably probable that the result would have been more favorable to the appellant but for the error. (*In re Celine R.* (2003) 31 Cal.4th 45, 59-60.) ICWA error is reviewed under this test. (*In re Alexis H., supra*, 132 Cal.App.4th at p. 16.)

9

In this case, Ryan was placed with his father and jurisdiction was terminated. Ryan was not placed in foster care and neither parent's parental rights were terminated. Neither mother nor any Indian tribe has suffered any prejudice from any alleged error.

## II. The juvenile court did not err in placing Ryan with father and terminating jurisdiction

Mother next argues that the juvenile court erred when it terminated jurisdiction and gave sole legal and physical custody to father.[3] However, mother acknowledges that the juvenile court has broad discretion to make custody orders when it terminates jurisdiction in a dependency case. (§ 361.2, subd. (b); *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179; *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 265, fn. 4.) Thus, we review the trial court's decision to terminate jurisdiction and issue a custody order for abuse of discretion. (*In re Nada R.*, *supra*, at p. 1179.) Under this standard, we will not disturb the order unless the court "'''''exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].''''' [Citations.]" (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

Mother has failed to show an abuse of the juvenile court's discretion. Mother argues that the court's primary consideration must always be the best interests of the child. (*In re Nicholas H., supra*, 112 Cal.App.4th at p. 268.) She argues that father was not a stable, positive force in Ryan's life prior to the dependency proceeding. In addition, mother claims, father failed to show that he knew how to take care of Ryan. Mother points to the incident when father returned Ryan to her with wet pants because father did not have any diapers. Mother insists that with Martin out of her life, a significant safety hazard has been removed from her home, and that Ryan was otherwise healthy and free from abuse.

---

[3] DCFS has not responded to this portion of mother's appeal. DCFS has declined to take a position on this issue because DCFS opposed an order placing Ryan in his father's custody at trial. DCFS asserts that father is the appropriate party to respond to mother's arguments on this point.

10

Mother's arguments are not persuasive. Father was a nonoffending parent, and there was no evidence presented to the juvenile court suggesting that Ryan was at risk in father's care. The sole objection of DCFS involved the refusal of neighbors living near father to submit to criminal checks.

As the juvenile court noted, a parent has a fundamental right to parent his child. (*Johnson v. Department of Social Services* (1981) 123 Cal.App.3d 878, 885.) As set forth in *In re Isayah C.* (2004) 118 Cal.App.4th 684, 697:

> "[A] nonoffending parent has a constitutionally protected interest in assuming physical custody, as well as a statutory right to do so, in the absence of clear and convincing evidence that the parent's choices will be 'detrimental to the safety, protection, or physical or emotional well-being of the child.' [Citations.]"

Section 361.2 expressly addresses the juvenile court's obligation to place the child with a previously noncustodial parent under the circumstances present here. (§ 361.2, subd. (a).) If a previously noncustodial parent desires custody of the child, the statute mandates that the juvenile court "*shall* place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (*Ibid.*, italics added.) The statute thus expresses a clear direction to the court to place the child with a noncustodial parent under circumstances such as those present in this case. If the juvenile court had not placed Ryan with father, the court's order would be a violation of father's constitutional and statutory rights.

Upon selecting this custody arrangement, the court had clear authority to terminate jurisdiction. (§ 361.2, subd. (b)(1); *In re Karla C.* (2010) 186 Cal.App.4th 1236, 1244 [where child is placed with nonoffending noncustodial parent and there is no need for ongoing supervision, court may terminate jurisdiction and grant the parent sole legal and physical custody].)

Mother was not entitled to reunification services. Section 361.2, subdivision (b)(1), provides that once a child is placed with a previously noncustodial, nonoffending

11

parent, "[t]he court shall then terminate its jurisdiction over the child." Because Ryan was in the care of father, an order of reunification services for mother was unnecessary. As the juvenile court explained, mother has the option of petitioning the family court for a change in the custody order.

Mother has failed to establish that the juvenile court abused its discretion. On the contrary, the juvenile court's actions appear to be entirely appropriate under applicable law.

## DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.*
FERNS

_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.