Filed 6/20/14  In re Jesse S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re JESSE S., a Minor. | |
| JOYCE S., | F068299 |
| Petitioner and Respondent, | (Super. Ct. No. AT-3151) |
| v. | |
| JERRY G., | **OPINION** |
| Objector and Appellant. | |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Sharon Elizabeth Mettler[†] and John D. Oglesby, Judges.

Amy Z. Tobin, under appointment by the Court of Appeal, for Objector and Appellant.

Joyce S., in pro. per., for Petitioner and Respondent.

-ooOoo-

---

[*]Before Kane, Acting P.J., Peña, J., and Sarkisian, J.[‡]

[†]Retired judge of the Kern Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[‡]Judge of the Fresno Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## INTRODUCTION

On appeal, Jerry G. (Father) argues the juvenile court abused its discretion by granting Joyce S.'s (Mother) petition pursuant to Family Code section 7822 because the court did not act in Jesse S.'s best interests, as compelling evidence established the minor wanted a relationship with Father. Father also contends the court's order granting the petition must be conditionally reversed due to insufficient compliance with the notice provisions of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) We will affirm.

## PROCEDURAL AND FACTUAL SUMMARY

Mother and Father met in 2003. After Mother became pregnant and advised Father of the pregnancy, he became threatening; Father advised Mother he had been told by someone that her child was not his and he did not want to be listed on the birth certificate. In July of that year, Mother ended the relationship and obtained a restraining order against Father.

When the minor was about a year old,[1] Mother and Father established a visitation plan. They began dating again and became engaged in the summer of 2007. Ultimately, however, their relationship ended due to Father's anger. Court-ordered visitation plans were established in 2008. Following a modification of the plan by the court in June 2009, Father stopped contacting Mother to arrange visitation with the minor.

In June 2011, Mother was served with paperwork indicating Father was seeking visitation; a hearing was set for July 18, 2011. Mother appeared for the hearing, however, Father did not. On that date, sole legal and physical custody was awarded to Mother. Father was to have reasonable visitation with the minor, contingent upon, inter alia, his providing Mother with advance notice of his intent to commence visitation and proof of three negative or clean drug test results from an approved lab.

---

[1]The minor was born in January 2004. The father of the child was not identified on the birth certificate.

In April 2012, Mother filed a petition pursuant to Family Code[2] section 7822 seeking to free the eight-year-old minor from the custody and control of Father; Father had not seen his son in over a year and did not provide support for nor communicate with him, thus establishing intent to abandon. Accordingly, a citation was issued to Father ordering he appear on May 25, 2012.

An investigator's report was filed on or about May 16, 2012. After interviewing the minor, Mother, and Father, the family court services investigator recommended Father's parental rights be terminated.

On May 25, 2012, the juvenile court appointed counsel to represent the minor. Father was also appointed counsel. Further proceedings were to be held July 13, 2012.

Despite Father having previously advised the investigator that he had "no known Indian ancestry," on July 13, 2012, Father advised "the court of his American Indian heritage." (Some capitalization omitted.) Thereafter, a number of continuances were granted in order to allow for the Native American Indian tribes identified by Father to receive the required notice of the proceedings in accordance with the provisions of the ICWA.

Eventually, in August 2013, the juvenile court declared notice had been completed as required pursuant to the ICWA, and the matter was set for hearing.

On September 20, 2013, the hearing on Mother's petition commenced; testimony was taken, and argument was heard.

Further proceedings were held October 18, 2013. On that date, the juvenile court granted Mother's petition, and Father's parental rights were terminated.

On October 24, 2013, Father filed a notice of appeal. Judgment was entered October 25, 2013.

---

[2]All further statutory references are to the Family Code unless otherwise indicated.

DISCUSSION

## I. The Best Interests of the Child

Father contends that because the minor wished to have a relationship with him, the juvenile court abused its discretion by finding termination of his parental rights was in the minor's best interests. He also contends the minor's stability and security were not in jeopardy because Mother had full custody, but by terminating his parental rights, the minor was placed at risk. We are not persuaded.

### A. The Applicable Legal Standards

"Under section 7822, a court may declare a child free from a parent's custody and control if the parent has abandoned the child. Abandonment occurs when a 'parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, *or* without communication from the parent, with the intent on the part of the parent to abandon the child.' (§ 7822, subd. (a), italics added.) Thus, a section 7822 proceeding is appropriate where 'three main elements' are met: '(1) the child must have been left with another; (2) without provision for support or without communication from … his parent[] for a period of one year; and (3) all of such acts are subject to the qualification that they must have been done "with the intent on the part of such parent … to abandon [the child]."' [Citation.] 'The … failure to provide support, or failure to communicate is presumptive evidence of the intent to abandon. If the parent … ha[s] made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent ….' (§ 7822, subd. (b).)" (*Adoption of Allison C*. (2008) 164 Cal.App.4th 1004, 1010, fn. omitted.)

If the court finds abandonment, then it must consider the child's best interests before deciding whether to terminate parental rights. (*Neumann v. Melgar* (2004) 121 Cal.App.4th 152, 156.) The best interests of the child are paramount in interpreting and implementing the statutory scheme for terminating parental rights. (*Id*. at p. 162.) Section 7890 provides that the "court shall consider the wishes of the child, bearing in mind the age of the child, and shall act in the best interest of the child."

This court applies a substantial evidence standard of review to the trial court's findings, keeping in mind that in a section 7822 proceeding, all of the trial court's findings must be made by clear and convincing evidence. (§ 7821; *In re Amy A*. (2005)

132 Cal.App.4th 63, 67.) We cannot consider the credibility of witnesses, attempt to resolve conflicts in the evidence, or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the trial court's order, and affirm the order even if there is substantial evidence supporting a contrary finding. (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. The direct evidence of one witness is sufficient to prove a fact. (Evid. Code, § 411.)

### B.     The Juvenile Court's Findings

Following the testimony and argument heard September 20, 2013, the juvenile court found as follows:

> "[T]he Court finds as follows: The father did abandon the child for a significant period of time. The issue, I think, factually as it comes down, is during that time period, and by his own admission from May of '08, which I think is actually a date the mother agrees to, he did not have any contact with his son up until today's date. The reasons that he has given for that, he was clear from the record and oddly enough he doesn't—he blames it on a depression that he suffered from a result of the accident and from, in part, he didn't make the Court hearing based upon a technical violation of the law. He is [simply] arguing through counsel … that he maintained communication and also that he could not contact his child because the mother's both change of address and lack of cooperation; that he did maintain contact through his grandmother [*sic*: mother] and sister.

> "They testified that they, in collaboration with [Father], communicated and sent gifts on a regular basis to the child up to and through approximately 2011. That testimony, though, is somewhat contradictory to the testimony of [Father]; that he has, in any of the witnesses's [*sic*] own testimony, that they did not know where the child was. Inherently, in some of his testimony the Court finds it is rather contradictory.

> "[Mother] had been clear that there were not attempts to contact the child. The only potential one that she didn't directly address was when the grandmother showed up when she was at Brundage Lane. But there was nothing to indicate that that was their visit on behalf of [Father]. The Court notes that the one letter that we do have, the one documentary evidence, the

5.

letter sent by the aunt to [the minor] postmarked 27, October 2011, was returned as no such address, unable to forward. When you read that card, the card is not sent on behalf of [Father] and the aunt. It is sent on behalf of the aunt, only.

"The Court also finds specifically that I did not find the testimony credible of the grandmother, who was the second civilian witness to testify, on the issue that she did the communication in corroboration with her son. I found that particular testimony on her part as being not credible, and I did not believe her testimony on that.

"Regarding the aunt's testimony, I do find her credible on that issue that she did discuss the communication with the child, but it's interesting to note in her particular case there was not a factual corroboration with that. So in light of the factual corroboration, I guess I'm backing into the position that I'm not finding the aunt particularly credible that they were acting as agents of [Father] during this time period.

"[Father] admits he was involved in an auto accident in 2008 and suffered significant injuries. He was hospitalized for a couple of days. Thereafter, he suffered a string of arrests for control[led] substances, marijuana, as well as other substances. Some of these were dismissed. He did suffer a conviction for possession for sales of methamphetamine in 2010 and a subsequent arrest for—suffered a conviction in 2010 when he was arrested from the date—I would suspect would have been 2010, as well. He was suffered—arrested for simple possession in 2011 and was convicted of that in February of 2012.

"So it is clear, based upon the auto accident, the physical injuries, his depression, and his substance abuse issues which he's now finally beyond, according to his testimony, that there was a substantial period of time where this Court finds he made no reasonable or significant efforts to contact his child other than the motion that he filed in court which he did not appear because he was in violated [*sic*] for a technical violation, as he state[s], he caught a technicality. That technicality appeared to be a new arrest for under the influence of a controlled substance and possession of paraphernalia, both misdemeanor offenses. I'm not sure how that's a technicality. That appears to be a direct violation of the conditions of probation that he was on."

Before ultimately deciding whether to grant or deny Mother's petition, the juvenile court asked Father's counsel to provide a brief addressing the propriety of the court's consideration of Father's recent rehabilitation efforts and successes. The parties were ordered to return on October 18, 2013.

6.

When the matter resumed in October, the court indicated it had read the brief. It permitted Father's counsel, Mother, and minor's counsel to argue or comment further, then found as follows:

"Thank you. With that, having heard the evidence, I've already, I think, articulated the Court's findings several times now. The Court is appreciative of the input from all sides. Counsel who have appeared in front of me know that I find these cases to be particularly challenging. But there is an aspect that the Court—which the mother has brought out, which I had, perhaps, overlooked. And that, I think, can be best summarized by the portion of [Father]'s testimony which struck me at the time, but I didn't quite know what context to put that in. And to put this in the context of it, the Court has to look at what's in the best interest of the child, not necessarily what the child wants. I think any child wants to have a father involved in their life, but the best interest of the child is to have a father that's involved in the child's life on a constant basis; that is, in a regular, responsible fashion.

"[Father], as the mother has pointed out, has a demonstrated history of being less than responsible for not seeing the child.

"The summary provided in the Family Court Services report which the Court must consider, goes as follows: This investigator contacted by phone to discuss the Petition with [Father]. [Father] began by saying, quote, 'I haven't seen my child for three years. I've had a lot of health problems. I've had a bad car accident. I've been on a lot of medications.'

"Regarding contact, [Father] indicated, [t]he mother won't return his calls. 'She won't return my mother's calls. Every time we did an exchange, she wouldn't show up. I just shut down and didn't pursue things.'

"Regarding the filing of 2011, [Father] stated, quote, 'I haven't seen him between three and five years. I got my mind right now. I was incarcerated in July of 2011. When that court date came, I tested clean for Prop 36. I have a lot of issues in handling the paperwork. So I haven't been able to file the necessary paperwork.' And Family Court Services recommended termination be granted.

"The Court is always concerned with the parties' improvement of behavior, and as a general practice in legal matters, whether it's criminal or civil in nature, we reward good. We take actions to detour bad behavior, of which parties have been victimized.

7.

"[Father]'s bad behavior, essentially, has victimized his son, as well as the mother of the child for a number of years. When he was contacted regarding this … there was no acknowledgement of really any direct responsibility that [Father] has. He admitted he hadn't seen the child, but he explained it as health problems, car accident, a lot of medications, and the mom. It's the mom's fault, and I just sort of got fed up and shut down.

"What I found was interesting was his testimony regarding the last jail sentence he served, and he used a phrase that I found remarkable. He's consistent with his previous attitude and demonstrated behavior, and this was the time period when he had testified after he had last stopped using controlled substances. I think it was in August, roughly. And his testimony was that he had to go back to jail because he caught a technicality; that is, he was found in violation of probation sufficient to justify him being sent back to custody.

"And there was no acknowledgement by him in that statement that he was responsible in any fashion. It was just he caught a technicality. I think that demonstrates to this Court his current attitude which, if he is truly a sober person, is a recognition and acceptance of his past mistakes and that he had some responsibility in it, but despite his testimony that he's reformed and changed his life, there has been no testimony from him, really, accepting responsibility for where he finds himself and the problems that he has caused in his son's life.

"And I think his phrasing even now to say he caught a technicality, rather than to say 'Yeah, I've screwed up. I violated my probation. It was time for me to go back to jail.' There was no recognition of that. His statement was, essentially, as we would look at it from a normal point of view, you know, I caught a technicality. It really was my fault [*sic*]. I didn't do anything wrong. And with that type of attitude that he's considering to continue to demonstrate, I will grant the Petition for abandonment in this matter; terminate the father's parental rights at this time."

## C.    Our Analysis

Initially, we note Father is not challenging the juvenile court's finding regarding abandonment. Rather, he challenges only the second relevant finding: that terminating his parental rights was in the minor's best interests. We find substantial evidence supports the juvenile court's determination.

Although the minor expressed to the investigating officer the fact he was "'sad' his father ha[d] not seen him 'for a long time,'" and, through counsel, expressed a desire

to see his Father in June 2012 and a desire to have a relationship with his Father in May 2013,[3] the juvenile court did not abuse its discretion in granting Mother's petition to terminate Father's parental rights. The juvenile court clearly considered the minor's wishes. (*Neumann v. Melgar*, *supra*, 121 Cal.App.4th at p. 156.) Nevertheless, weighed against Father's lack of credibility, his significant criminal history involving controlled substance sales and abuse, and his unwillingness to accept responsibility for his own actions, it carefully determined the minor's *wishes* must give way to that which is in his *best interests*.

We have reviewed the record and have found the juvenile court's findings to be supported by substantial evidence. Father admitted it had been at least three years since he had last seen his son. It can be reasonably inferred from this record that Father did not regularly or routinely exercise his visitation rights. The record reveals Father's last attempt at visitation was in July 2011. Within days however, Father was arrested for possession of a controlled substance and possession of drug paraphernalia. Instead of acknowledging at the time of the hearing that his behavior in July 2011 was criminal and irresponsible, Father characterized his most recent brush with the law as a "technical violation" or "technicality." Such a characterization by Father in 2013 is suspect given his claims of sobriety and reform. The record as a whole supports the juvenile court's findings for it evidences Father's willingness to blame others, and in particular Mother (whom the court found to be credible), for his own shortcomings. That is also evident in the investigator's report.

The investigator's report, although acknowledging the minor's wishes, recommended Father's parental rights be terminated because his actions demonstrated a "lack of follow through" and a "lack of intent" to maintain a relationship with his son.

Mother was aware of the minor's wishes as expressed to the investigator and his counsel; however, she testified the minor does not often ask about his father. Mother

---

[3]Otherwise, counsel for the minor took no position on the petition.

9.

testified Father's failures to visit, to communicate with, and to provide for the minor in the past are the reasons she believed termination of Father's parental rights were in the minor's best interests. The juvenile court expressly found Mother's testimony to be credible, and determined Father's testimony, as well as the testimony provided by his sister and mother, lacked credibility.

Other than the minor's sadness because of his father's absence, there is no evidence indicating the minor is emotionally disturbed by that absence, nor is there evidence the two ever established any bond.

We are not persuaded by Father's argument that "minor's stability and security" were "put at risk by the court's order" because of the potential for "a myriad of circumstances which could result" in Mother's unavailability or death. Nothing stated in the Family Code provisions requires there be a pending adoption for a parent's rights to be terminated. However, section 7800 states that "[t]he purpose of this part is to serve the welfare and best interest of a child by providing the stability and security of an adoptive home when those conditions are otherwise missing from the child's life." Father relies on the reference to "adoptive home" in section 7800 for his contention the lower court abused its discretion since there was no evidence of any pending adoption here.

In *In re Marcel N.* (1991) 235 Cal.App.3d 1007, a mother sought to terminate the parental rights of her ex-husband over their two minor children pursuant to former Civil Code section 232, the predecessor statute to Family Code section 7822 (*In re J.W.* (2002) 29 Cal.4th 200, 204), claiming he had abandoned the children for more than one year. Former Civil Code section 232 stated the same standards for termination as those at issue here, and stated the same "adoptive home" purpose as in the present Family Code section 7800. (*In re Marcel N., supra*, at p. 1011.) In *Marcel N.*, the former husband argued the juvenile court had no jurisdiction to proceed because there were no adoptions pending.

The court in *Marcel N.*, quoting the California Supreme Court's construction of former Civil Code section 232 in a parental termination case regarding foster children,

determined that one parent's rights could be terminated upon proper petition by the other parent in the absence of an "'adopting parent waiting in the wings.'" (*In re Marcel N.*, *supra*, 235 Cal.App.3d at pp. 1011-1012, quoting *In re Laura F.* (1983) 33 Cal.3d 826, 838.)[4] The *Marcel N.* court noted that while the stated purpose of the subject provisions was to permit terminations where adoption was the goal, it did not prohibit such proceedings for other purposes. (*In re Marcel N., supra*, at pp. 1011-1013.) The court also pointed out that "if read literally, … proceedings could never be used to terminate the parental rights of one parent if the second parent was providing a stable and secure home for a child" and could raise obvious equal protection problems regarding the comparative ability of remarried and single mothers to pursue the termination of a father's parental rights. (*Id.* at p. 1013; see also *In re Randi D.* (1989) 209 Cal.App.3d 624, 628 [majority holding former Civ. Code provision "contemplates severance of the parental right … without reference to whether or not adoption proceedings are pending"].)

In this case, the juvenile court carefully considered the minor's wishes against those circumstances that would affect his best interests, including Father's failure to accept responsibility for his own actions and his criminal conduct. We find there is substantial evidence to support the juvenile court's findings and the order terminating Father's parental rights.

## II. The Notice Requirements Pursuant to ICWA

Father also argues there was insufficient compliance with the notice provisions of the ICWA. Thus, he maintains, a reversal or limited reversal is required. This contention lacks merit.

---

[4]The California Supreme Court found that, despite former Civil Code section 232's same reference to "adoptive home" in its statement of purpose, there was no authority "for the proposition that termination is improper unless there is an adopting parent waiting in the wings. The statute itself imposes no duty on the superior court to make an express finding as to the prospects for adoption of a particular child." (*In re Laura F.*, *supra*, 33 Cal.3d at p. 838.)

11.

## A.     The Relevant Law

A proceeding to terminate parental rights under section 7800 et seq. is a "child custody proceeding" within the meaning of the ICWA.  (*In re Crystal K.* (1990) 226 Cal.App.3d 655, 660-666.)  An Indian child is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  (25 U.S.C. § 1903(4).)

As this court has previously stated, "The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes and families."  (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469.)

> "To ensure a tribe's right to intervene, the ICWA requires 'where the court knows or has reason to know that an Indian child is involved,' the party seeking termination of parental rights must, in relevant part, notify the Indian child's tribe of the pending proceedings and its right to intervene. (25 U.S.C. § 1912(a); ….)  Indeed, if the identity or location of the tribe cannot be determined, the notice shall be given to the Secretary of the Interior (Secretary).  (25 U.S.C. § 1912(a).)  The burden of identifying and providing notice to the proper tribe then shifts to the Secretary who presumably has more resources and skill with which to ferret out the necessary information.  [Citation.]  Once the Secretary receives the statutory notice, the Secretary has 15 days within which to provide notice to the tribe or notify the court that it needs additional time to do so. [Citation.]

> "This court has characterized notice as a 'key component of the congressional goal to protect and preserve Indian tribes and Indian families.'  [Citation.]  We also have observed:  'the statute and all cases applying the Act unequivocally require *actual notice* to the tribe [or the Secretary]' of both the proceedings and of the right to intervene.  [Citation.] The requisite notice to the tribe serves a twofold purpose:  (1) it enables the tribe to investigate and determine whether the minor is an Indian child; and (2) it advises the tribe of the pending proceedings and its right to intervene or assume tribal jurisdiction.  [Citation.]"  (*In re Desiree F.*, *supra*, 83 Cal.App.4th at pp. 469-470.)

In 2006, the Legislature enacted Welfare and Institutions Code section 224.2, which "largely tracks the ICWA."  (*Tina L. v. Superior Court* (2008) 163 Cal.App.4th 262, 266.)  That section provides that notice shall include "[a]ll names known of the

Indian child's biological parents, grandparents, and great-grandparents …." (Welf. & Inst. Code, § 242.2, subd. (a)(5)(C).)

A tribe's "decision that a child is or is not a member, or [is or is not] eligible to be a member, is determinative." (*In re Desiree F.*, *supra*, 83 Cal.App.4th at p. 470.)

We review for substantial evidence the trial court's findings whether proper notice was given under the ICWA and whether the ICWA applies to the proceedings. (*In re Christian P.* (2012) 208 Cal.App.4th 437, 451.) Deficiencies in the ICWA inquiry and notice may be deemed harmless error when, even if proper notice had been given, the child would not have been found to be an Indian child. (*In re E.W.* (2009) 170 Cal.App.4th 396, 402; *In re S.B.* (2005) 130 Cal.App.4th 1148, 1162.)

## B.  Our Analysis

In this case, once the juvenile court became aware of the possibility the minor might be an Indian child in light of Father's advisement of July 13, 2012, actions were taken to effect notice pursuant to the provisions of the ICWA. Father was directed to provide his attorney "with all information available to him about his American Indian heritage" (some capitalization omitted), and counsel was to forward that information to Mother.[5]

On July 26, 2012, Father's counsel sent Mother a letter wherein the following information was provided pursuant to the court's directive:

> "▪Tribe: Cherokee and Chata[6]
>
> "▪ Father's Pater[]nal Great Great Aunt, Betty [K.] is registered with the Bureau of Indian Affairs. Betty [K.]'s address [and] telephone no. [are given]
>
> "▪ Father's Paternal Great Great Grandmother, Sally [D.] was ¾ Cherokee Indian.[7]

---

[5]Mother was not represented and appeared without counsel throughout the proceedings.

[6]"Chata" is not a federally recognized tribe. <http://www.bia.gov/WhoWeAre/BIA/OIS/TribalGovernmentServices/TribalDirectory/>

[7]Sally D. was presumed to be deceased.

"If you need further information, please feel free to contact Betty [K.]."

Thereafter, on or about September 14, 2012, Mother employed Judicial Council form ICWA-030 to notify the Secretary of the Interior, the Bureau of Indian Affairs, and the Cherokee Nation in Tahlequah, Oklahoma of the potential for the minor's Indian heritage. Specifically, on the third page of the form, Father's biological mother and father were identified by name and address, if known. At page 5 of the form, no persons were identified as Father's biological grandmother or biological grandfather. The form provides no spaces for information concerning great-aunts or great-great-grandmothers. It appears, however, that Mother included the letter from Father's counsel along with the minor's birth certificate as attachments to the form.[8]

In a letter dated September 25, 2012, the Cherokee Nation responded that it had examined its tribal records and determined the minor was not an Indian child of the Cherokee Nation. While the form Mother employed did not list Father's great-great-grandmother Sally D., that information was clearly provided and considered because the Cherokee Nation letter expressly identifies "Sally [D.] DOB ???????? Paternal gggrt grandmother of Jesse" as an adult relative included in its examination of the tribal records.

Thereafter, the record on appeal reflects a series of continuances between September 21, 2012, and June 7, 2013. The record does not contain reporter's transcripts of those proceedings, yet it appears the continuances were based primarily on ensuring ICWA notice requirements were met.

On July 19, 2013, about one year after Father notified the court of the minor's potential Indian heritage, notice remained an issue. Father's counsel claimed Mother's notice was missing two names of Father's relatives who were "registered with the

---

[8]Completed return receipt forms were filed with the juvenile court indicating completed service upon Father, the Secretary of the Interior, the Cherokee Nation, and the Sacramento Area Director for the Bureau of Indian Affairs.

14.

Cherokee, Chickasaw Nation." Counsel identified the missing names as Betty K. and Sally D., the latter purportedly "registered with the Chickasaw Nation." Mother indicated she provided all information as it was provided to her from Father's attorney. The juvenile court sought to clarify Father's counsel's concern about insufficiency of notice:

> "THE COURT: So the two items would need further notice to be provided would be to the two names which were previously indentified in the letter, which has been attached to [Mother]'s declaration Notice of Child Custody Proceedings for Indian Child, which was filed in October.
>
> "And, [counsel for Father], one, is the great aunt, and the other is the great-great grandmother?
>
> "[FATHER'S COUNSEL]: I think the Court is referring to our letter to [Mother] of July 26.
>
> "THE COURT: Yes. She attached [that letter]. What was the process—I guess you provided an address for Betty [K.]?
>
> "[FATHER'S COUNSEL]: Correct.
>
> "THE COURT: She's registered with the Bureau of Indian Affairs. So, eventually, she'd have to be notified in that return receipt, I think, with a notice to the Bureau of Indian Affairs, as well.
>
> "[FATHER'S COUNSEL]: Exactly, she has to give notice to both.
>
> "THE COURT: Both. And then on the paternal great-great grandmother, I would assume that she's deceased.
>
> "[FATHER'S COUNSEL]: I would presume that, too, Judge. And I—
>
> "THE COURT: Notice on that would be given to the Bureau of Indian Affairs?
>
> "[FATHER'S COUNSEL]: Exactly. And I don't think [Mother] is obligated to do anything more than reasonable diligence to try and get the last-known address, but if she, in fact, is registered, then the tribe, nation, or band would have that information, and I think that's as far as we need to go."

The matter was continued to August 23, 2013, to provide Mother with an opportunity to provide "supplemental notice" on those two individuals.

15.

When the parties returned to court in August 2013, the notice matter was discussed further:

> "[THE COURT:] Now, this seems to be—it's concerned with ICWA …. I'm a little puzzled [Father] said he did not have any Indian, but we've now got service on one tribe, the Secretary of the Interior, the BIA, and a relative that apparently that is not a grandparent. The Cherokee office has said—I see a great aunt registered, but the Cherokee tribe says that's not enough. It has to be in lineal descendant. It would appear to me that ICWA is taken care of. [¶] Does anyone disagree with that?

> "[FATHER'S COUNSEL]: Well, Your Honor, we were last in court on June 7th.[9] And we found some errors in the notice of Child Custody Proceeding for Indian child. I talked to [Mother] this morning. She was to renotice because of the errors in the names that she had some in her previous notice. She said she filed that with the court, but I have not received a copy of it.

> "THE COURT: What errors were there?

> "[FATHER'S COUNSEL]: I believe— [¶] Where are the errors? [¶] Yes. Attached to the—I'm looking at the document—

> "THE COURT: The first notice?

> "[FATHER'S COUNSEL]: Yeah, on 5/20 that she had filed, the very last page. Chickasaw Nation listed the names that were incorrect because they could not locate those files and those family members.

> "THE COURT: I'm sorry. Chickasaw or Cherokee?

> "[FATHER'S COUNSEL]: The letter we have is Chickasaw.

> "THE COURT: I don't know—

> "[FATHER'S COUNSEL]: It is a memorandum. It's dated March 25th. [¶] So I'm not sure what [Mother] has filed since the last—

> "THE COURT: I have a Cherokee Nation letter.

---

[9]The reporter's transcript for the June 7th proceeding indicates minor's counsel represented to the court that Mother "did all her work and notified all the tribes. They all responded saying there is no—they are not going to do anything. The one issue was an acknowledgement she had needed from [Father], which [Father's counsel] has now signed." Counsel for Father explicitly agreed with this statement.

16.

"[FATHER'S COUNSEL]: I don't have that letter, Your Honor.

"THE COURT: It is a letter to the Court from the Cherokee Nation.

"[FATHER'S COUNSEL]: I did have one—

"THE COURT: October 1, 2012.[10]

"[FATHER'S COUNSEL]: I have one dated December 21, 2012.

"THE COURT: From the Cherokee Nation?

"[FATHER'S COUNSEL]: Right.[11]

"THE COURT: Well, you're one up on us. I have a return of service on Cherokee Nation, security of the interior. Should be the secretary. But it is done. And [Father] and Sacramento area BIA. And I have your letter to her last July, pursuant to ICWA, providing father's native American ancestry, paternal great aunt, Betty [K.] and paternal great grandmother Sally [D.]. [¶] Then—

"[FATHER'S COUNSEL]: It was just my understanding, Judge, that after the 06/07 hearing, [Mother] was to give notice with the corrected names. She said today she did and she filed with the Court. So that's—I think, that's where we're hung up on this.

"THE COURT: Well, unfortunately, there is nothing in the minutes that say that's what the problem was. The letter from the Cherokee Nation has a Sally [D.] listed as the—so they would appear to have notice of Sally [D.], who is a lineal descendant, and then what she gave notice to on the next one, that she mailed it to Betsy or Betty [K.]. She mailed notice to the aunt. [¶] Now, you have a Chickasaw letter?

"[FATHER'S COUNSEL]: Yes.

"THE COURT: Does your client claim anything beyond Cherokee?

"[FATHER'S COUNSEL]: Yes. The great grandmother, her maiden name is Sally [D.], was registered in the Chickasaw Nation.

---

[10]The Cherokee Nation's letter is dated September 25, 2012. The letter was filed with the court on October 1, 2012.

[11]The record on appeal does not contain a letter dated December 21, 2012.

"THE COURT: Well, I'll tell you. Your letter to her that she's been doing this work on for the last year says [Sally D.] was three-quarters Cherokee and that the tribes you listed were Cherokee and Choctaw.[12] And that's a letter from a year ago, July 26, 2012. There was nothing said about Chickasaw in your letter. Now, there may be another letter, but if she's three-quarters Cherokee, I don't know how she could be a member of Chickasaw. So I'm kind of wondering why your client, one, said that []he had no Indian ancestry, and then it was Cherokee and Choctaw, which I looked for in the federally recognized tribe and found no Choctaw tribe. [¶] Now you're saying Chickasaw. So who contacted the Chickasaw?

"[FATHER'S COUNSEL]: Well, we provide[d] that information to [Mother]. I have a letter that we received from the Chickasaw Nation March 26 this year.

"THE COURT: What do they say?

"[FATHER'S COUNSEL]: They say that it's in receipt of the documents from the office requesting verification of child status as an Indian child. Please be advised that the names listed above are not locate[d] in Chickasaw Nation tribal records. Therefore, based on the information provided, it is the position of the Chickasaw Nation that the child named above is not an Indian child.

"THE COURT: Well, may we make a copy of that for our records.[13]

"[FATHER'S COUNSEL]: Sure.

"THE COURT: Okay. Are there any other possible tribes[?]

"[FATHER'S COUNSEL]: No, Your Honor.

"THE COURT: Okay. Do you have any idea what Choctaw is that's in you[r] letter here?

---

[12]The letter actually states "Chata" not "Choctaw." Further, it appears the court intended to say "Chata" as referenced in the letter for there is not a federally recognized "Chata" tribe whereas there is a "Choctaw" tribe. Although a court may allow a non-federally recognized tribe to appear in the proceeding and present information to the court (Welf. & Inst. Code, § 306.6), there is no requirement that any notice be sent to a tribe that is not recognized. The requirements of the ICWA apply only to federally recognized tribes. (25 U.S.C. § 1903(8); *In re A.C.* (2007) 155 Cal.App.4th 282, 286.)

[13]Apparently no copy was made as the court's record does not contain correspondence from the Chickasaw Nation.

"[FATHER'S COUNSEL]: I don't, Your Honor. We provided a packet to [Mother] of everything that we knew at the time, and that's all we have.

"THE COURT: But the Choctaw—I mean, I literally—because of this case, I went on line and I looked up the federally registered ones. And there's over 500 of them, and I not only looked in alphabetical order under *C-h-a*, I went down and looked under eastern Choctaw or some other name that would go with it. I could find no tribe with that name. So your client is sitting here now. Can he represent to the Court what that is supposed to be.

"[FATHER]: It's supposed to be a branch off of Cherokee. There is different branches off Cherokee. There are different tribes from the Cherokee tribe, different branches. There's Chickasaw and Choctaw—

"[FATHER'S COUNSEL]: That's the only ones we have.

"[FATHER]: Yeah, those two.

"[FATHER'S COUNSEL]: Choctaw, Chickasaw. That's all the information we really have.

"[FATHER]: My great aunt, Betty [K.], she printed all that stuff off the internet, my family history and mailed it to me, and I thought [I] brought it to my attorney …. He presented everything to the Court. [¶] … [¶]

"THE COURT: Well, is it your position that there's any other notice that needs to be given to a tribe, [counsel]?

"[FATHER'S COUNSEL]: I don't think so, Your Honor. I think we've done everything from our perspective that we can do. I just wanted to make sure the Court understood. We have provide[d] all that information.

"THE COURT: Right.

"[FATHER'S COUNSEL]: I'll let the Court make probable cause findings on that.

"THE COURT: What's your position?

"[MINOR'S COUNSEL]: I have no position.

"THE COURT: Okay. All right. So I'm going to make a finding and record should—the minutes should reflect that notice has been completed as required under ICWA …. And the matter is ready to proceed." (Italics added.)

19.

Following review of the record, we find the notice given pursuant to the ICWA was sufficient.

More particularly, Father advised Mother that his paternal great-great-grandmother Sally D. "was ¾ Cherokee Indian." However, the Cherokee Nation advised, in response to Mother's notice concerning same, that an examination of its tribal records revealed the minor, as a direct lineal descendant of "Sally [D.]," is not a Cherokee Indian child. As a result, it would not be intervening in the proceedings.

Father's counsel expressly advised the juvenile court that he was in possession of a memorandum dated March 2013 wherein the Chickasaw Nation advised the minor was not an Indian child based upon the information it was provided. Whatever information Father's counsel provided to Mother following the letter in July 2012 (wherein Sally D. was purported to be three-quarters *Cherokee*), the Chickasaw Nation plainly received notice of the instant proceedings for it acknowledged it was "in receipt of the documents from the office requesting verification of child status as an Indian child." In sum, the minor was not a lineal descendant of a Chickasaw Indian.

As to Father's complaints concerning notice to the Choctaw tribe, he expressly advised the court that he understood Choctaw to be a branch of the Cherokee Nation. Father's counsel then acknowledged Choctaw (via Cherokee) and Chickasaw were the only tribes at issue. Assuming the truth of the statement, the Cherokee Nation had already determined Sally D. was not a tribal member, as had the Chickasaw Nation.

Further, based upon Father's counsel's letter of July 26, 2012, it is also reasonable to infer that Father's great-aunt Betty K. is the individual "registered with the Bureau of Indian Affairs" as a member of the "Chata," Choctaw, or Chickasaw tribe since Father's paternal great-great-grandmother was expressly identified as "¾ Cherokee Indian." This inference is supported by the juvenile court's observation that if Sally D.—the only lineal descendant—is "three-quarters Cherokee" it is not at all likely "she could be a member of Chickasaw."

Any argument concerning ICWA notice insufficiency regarding Betty K., Father's great-aunt, lacks merit. The Cherokee Nation's letter dated September 25, 2012, provides as follows: "*Cherokee heritage is only determined by direct lineage such as: parents, grandparents and great grandparents. Extended relatives such as: aunts, uncles, and cousins, can not be used for this purpose.*" (Italics in original.) Thus, Betty K.'s heritage could not establish Cherokee Indian heritage for Jesse. Hence, the fact Betty K.'s name may have been omitted from the notice forms is of no moment as Jesse is not a lineal descendant of Betty K. Notice is to be provided to biological parents, grandparents, and great-grandparents. None of those relationship titles belong to Betty K.; she was identified by Father as his great-aunt.

It is significant here that Welfare and Institutions Code section "224.2 does *not* require that notice include information about great-great-grandparents." (*In re J.M.* (2012) 206 Cal.App.4th 375, 380.) Father identified Sally D.—the only lineal descendant to Jesse—as his "Great Great Grandmother." Therefore, because Sally D. is Father's great-great-grandmother, notice was not required under the ICWA's provisions. To the degree Father complains the Choctaw tribes should also have been given notice, we cannot agree for the same reasons: because Sally D. is Father's great-great-grandmother, notice was not required; neither is notice required regarding Father's great-aunt Betty K., for she is not a lineal descendant of Jesse.

In sum, ICWA notice provisions do not require that information be provided regarding great-great-grandparents. In any event, the Cherokee Nation notified the court that Jesse was not a Cherokee Indian child following review of its tribal records, a review that expressly included Sally D., the only lineal family member identified by Father. The Chickasaw Nation, as stated on the record by Father's counsel, also concluded that Jesse was not a Chickasaw Indian child. These determinations regarding the minor's eligibility for membership are conclusive for purposes of the ICWA. (44 Fed.Reg. 67584, 67586 (Nov. 26, 1979); Welf. & Inst. Code, § 224.3, subd. (e)(1); *In re Jack C.* (2011) 192 Cal.App.4th 967, 978.)

21.

In conclusion, we find sufficient evidence supports the juvenile court's finding that proper notice was given in this case pursuant to the ICWA.

## DISPOSITION

The judgment is affirmed.