Filed 6/25/21
See Dissenting Opinion

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> D.M., <br><br> Defendant and Appellant. | E075333 <br><br> (Super.Ct.No. J273637) <br><br> OPINION |

APPEAL from the Superior Court of San Bernardino County. Annemarie G. Pace, Judge. Affirmed.

Emily P. Uhre, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Jeffrey S. Moret, Supervising Deputy County Counsel, for Plaintiff and Respondent.

1

D.M. (sometimes father) appeals from an order terminating his parental rights to his biological daughter A.C. (sometimes child). He contends that there was a failure to inquire into whether he had Indian ancestry, as required by the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related federal and state law.

The issue arose because the mother plainly did have Indian ancestry — she was an enrolled member of a federally recognized Indian tribe; an older daughter had been removed from her custody and transferred to the jurisdiction of the tribe. Apparently no one thought it was worth asking whether the father, too, might have Indian ancestry. When the mother's tribe surprised everyone by reporting that the child was not a member and not eligible for membership, the juvenile court found — without any further inquiry regarding the father — that ICWA did not apply.

San Bernardino County Children and Family Services (CFS) does not dispute that there was an erroneous failure to inquire. It contends only that the father has not shown that the error was prejudicial.

We agree. The father has not claimed — in the juvenile court, in his opening brief, in his reply brief, or at oral argument — that he has any Indian ancestry. Because he has not managed to clear this rather low hurdle, there is no reason to suppose that, absent the error, the outcome would have been any different. And, more to the point, there is no reason to reverse and remand for a further inquiry, which would not only entail effort and expense, but would also delay permanency for A.C.

2

I

FACTUAL AND PROCEDURAL BACKGROUND

In November 2017, when the child was one year old, CFS received a report that the mother used methamphetamine, physically abused the child, failed to feed the child, and failed to obtain medical care for the child. When a social worker investigated, he found that the child had been left with the mother's roommate's sister (and occasionally others) for more than a week. In 2015, an older daughter had been removed from the mother's custody. The mother, when interviewed, admitted using methamphetamine.

Accordingly, CFS detained the child and filed a dependency petition concerning her. After a brief placement with the roommate's sister, the child was placed in foster care.

There was some initial uncertainty as to whether D.M. or one E.R. was the child's father; at the detention hearing, however, the mother definitively identified D.M. as the father. Subsequently, paternity testing ruled out E.R. In November 2017, CFS located the father, in prison.

In January 2018, at the jurisdictional/dispositional hearing, the juvenile court found that it had jurisdiction based on failure to protect (as to the mother only) and failure to support (as to the father only). (§ 300, subds. (b), (g).)[1] It formally removed the child

---

[1]    This and all further statutory citations are to the Welfare and Institutions Code unless otherwise indicated.

from the parents' custody and ordered reunification services for both parents.  It found

that the father was a presumed father.

In April 2018, the father was released on parole.

In January 2019, at the 12-month review hearing, the juvenile court terminated the

mother's reunification services.

In May 2019, at the 18-month review hearing, the juvenile court found that the

father had failed to participate in his reunification services plan and had made only

"minimal" progress.  It terminated the father's reunification services and set a hearing

under section 366.26.

In September 2019, the foster mother said she was interested in adopting the child.

In June 2020, at the section 366.26 hearing, the juvenile court terminated parental

rights.

II

FACTS AND PROCEDURE RELEVENT TO THE ICWA DUTY OF INQUIRY

At the detention hearing, the juvenile court adopted all orders recommended in the

detention report.  This included an order that all parents, specifically including the father,

file a Judicial Council Form ICWA-020, "Parental Notification of Indian Status"

(ICWA-020).  At that point, however, the father's whereabouts were unknown.

From the beginning of the dependency, the mother stated that she was a member

of the Confederated Tribes of the Colville Reservation (Colville Tribes), a federally

4

recognized Indian tribe. (85 Fed. Reg. 5462-01, 5463 (Jan. 30, 2020).) She filed an ICWA-020 to that effect.

CFS soon located the father in prison; however, as far as the record shows, it did not ask him whether he had any Indian ancestry, nor did it tell him that he had been ordered to file an ICWA-020.

In January 2018, the father made his first appearance, in custody, at the jurisdictional/dispositional hearing. However, the juvenile court did not order him to file an ICWA-020, and again, as far as the record shows, CFS did not ask him whether he had any Indian ancestry. In May 2018, after he was released, a social worker met with him, but again, apparently did not ask him whether he had any Indian ancestry. He never did file an ICWA-020.

Meanwhile, in November 2017, CFS sent an ICWA notice to the Colville Tribes and to the Bureau of Indian Affairs. It named E.R. as the father; it did not mention D.M.

CFS repeatedly filed "ICWA Declaration[s] of Due Diligence" listing E.R. as a "Search Source" but not mentioning the father.

In January 2019, in response to the ICWA notice, the Colville Tribes advised CFS that the child was not a member and not eligible for membership. Thus, at the 12-month review hearing, the juvenile court found that ICWA did not apply.

## III

## THE FATHER HAS NOT SHOWN THAT THE FAILURE TO INQUIRE INTO HIS INDIAN ANCESTRY WAS PREJUDICIAL

"Congress enacted ICWA to further the federal policy '"that, where possible, an Indian child should remain in the Indian community . . . ."'" [Citation.]" (*In re W.B.* (2012) 55 Cal.4th 30, 48.) California has adopted statutes and rules that "implement, interpret, and enlarge upon" ICWA. (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1157.)

Under both state and federal law, whenever "the court knows or has reason to know that an Indian child is involved" in a proceeding that could result in termination of parental rights, notice of the proceedings must be given to the relevant tribe or tribes. (25 U.S.C. § 1912(a); accord, § 224.3, subd. (a); Cal. Rules of Court, rule 5.481(c)(1).)

"'The Indian status of the child need not be certain to invoke the notice requirement. [Citation.] Because the question of membership rests with each Indian tribe, when the juvenile court knows or has reason to believe the child may be an Indian child, notice must be given to the particular tribe in question or the Secretary [of the Interior].' [Citation.]" (*In re B.H.* (2015) 241 Cal.App.4th 603, 606.)

Under federal law, the juvenile court "must ask each participant" in a dependency "at the commencement of the proceeding" "whether the participant knows or has reason to know that the child is an Indian child." (25 C.F.R. § 23.107(a) (2016); see also § 224.2, subd. (c).) It must also "instruct the parties to inform the court if they

6

subsequently receive information that provides reason to know the child is an Indian child." (*Ibid*.)

In addition, under state law, the juvenile court and the social services agency "have an affirmative and continuing duty to inquire whether a child for whom a [dependency] petition . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a).) As part of this duty, the social services agency must ask, not only the parents, but also the child's extended family members, whether the child may be an Indian child. (§ 224.2, subd. (b).) "If the parent . . . does not appear at the first hearing, or is unavailable at the initiation of a proceeding, the court must order the [social services agency] to use reasonable diligence to find and inform the parent . . . that the court has ordered the parent . . . to complete . . . form ICWA-020[]." (Cal. Rules of Court, rule 5.481(a)(3).)

The social services agency "must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status . . . ." (Cal. Rules of Court, rule 5.481(a)(5).)

Thus, the juvenile court erred by failing to ask the father, at his first appearance (or at any other time), whether he had any Indian ancestry. CFS also erred by failing to

7

ask the father and his extended family members[2] whether he had any Indian ancestry. Even assuming it did ask, it erred by failing to document its inquiries and their responses.

We turn, then, to whether the error was prejudicial.

"[A]ny failure to comply with a higher state standard, above and beyond what . . . ICWA itself requires, must be held harmless unless the appellant can show a reasonable probability that he or she would have enjoyed a more favorable result in the absence of the error.  [Citations.]"  (*In re S.B.*, *supra*, 130 Cal.App.4th at p. 1162; see generally Cal. Const. art. VI, § 13.)

This means a parent asserting failure to inquire must show — at a minimum — that, if asked, he or she would, in good faith, have claimed some kind of Indian ancestry. "Where the record below fails to demonstrate and the parents have made no offer of proof or other affirmative assertion of Indian heritage on appeal, a miscarriage of justice has not been established and reversal is not required.  [Citations.]"  (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1388; accord, *In re H.B.* (2008) 161 Cal.App.4th 115, 121; *In re N.E.* (2008) 160 Cal.App.4th 766, 769-771 [failure to ask father whether he had Indian ancestry was harmless where father "does not assert on appeal that he in fact has any Indian heritage"]; *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430-1431 [asserted failure to ask father whether he had Indian ancestry was harmless where father

---

**2**     The record does not show that CFS ever asked the father to identify his family members.  At a mediation, he identified a paternal aunt and asked that she be considered for placement; CFS agreed to assess her.  Later, CFS reported, with no explanation, that "[t]here are no relatives for placement at this time."

did not "make an affirmative representation of Indian heritage" on appeal] [Fourth Dist., Div. Two]; but see *In re J.N.* (2006) 138 Cal.App.4th 450, 461.)

The error here was not one of federal law. "[A]t the commencement of the proceeding" (25 C.F.R. § 23.107(a)), the father was unavailable. There is no federal duty to inquire of extended family members. In any event, assuming there was a federal statutory error, and assuming (without deciding) that the reversibility of such an error is a federal question (see *Chapman v. California* (1967) 386 U.S. 18, 21), there is a harmless error rule under federal law, too. (28 U.S.C. § 2111.) "[T]he party that 'seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted.' [Citations.]" (*Shinseki v. Sanders* (2009) 556 U.S. 396, 409.) "The party seeking to reverse the result of a civil proceeding will likely be in a position at least as good as, and often better than, the opposing party to explain how he has been hurt by an error. [Citation.]" (*Id.* at p. 410.) When the existence of prejudice turns on what the appellant knows, it is particularly appropriate to insist that the appellant make some affirmative showing of prejudice. (See *Id.* at p. 413 [holding error harmless where appellant "has not told the Veterans Court, the Federal Circuit, or this Court what specific additional evidence proper notice would have led him to obtain or seek."].)

The father argues that a parent will not necessarily be aware of his or her Indian ancestry. Part of the error here is that CFS failed to inquire of extended family members. Thus, we cannot know for certain whether the error did or did not prevent it from discovering Indian ancestry on the father's side. The flaw in this argument is that "an

9

appellant has the burden of producing an adequate record that demonstrates reversible error. [Citation.]" (*In re K.R.* (2018) 20 Cal.App.5th 701, 708 [Fourth Dist., Div. Two].) Admittedly, in *In re K.R.*, we recognized an exception to this rule when the record is inadequate because of the social services agency's failure to document its inquiries. (*Id.* at pp. 708-709; accord, *In re N.G.* (2018) 27 Cal.App.5th 474, 483-485 [Fourth Dist., Div. Two].) Nevertheless, in that case, the appealing parent was at least claiming that the child might have Indian ancestry. (*In re K.R., supra*, at p. 705; see also *In re N.G.*, *supra*, at pp. 478, 481.) In *In re Rebecca R.*, *supra*, we held squarely that such a claim is a minimal prerequisite of showing prejudice. *K.R.* and *N.G.* are thus consistent with *Rebecca R.*

The father relies on the principle — well-established since at least 2001 — that a parent can raise an ICWA notice issue for the first time on appeal. (*In re Suzanna L.* (2002) 104 Cal.App.4th 223, 232 [Fourth Dist., Div. Two]; *In re Marinna J.* (2001) 90 Cal.App.4th 731, 739.)[3] The rationale is that "'[t]he notice requirements serve the interests of the Indian tribes "irrespective of the position of the parents" and cannot be waived by the parent. [Citation.]' [Citation.]" (*In re Suzanna L.*, *supra*, 104 Cal.App.4th at pp. 231-232.) Presumably the court in *Rebecca R.* was well aware of this principle. In compliance with these cases, we are allowing the father to raise the issue.

---

**3**    *In re Isaiah W.* (2016) 1 Cal.5th 1 dealt with a different question: Whether a parent's failure to raise an ICWA notice issue in one appeal forfeits the ability to raise it in a later appeal. (*Id.* at pp. 6, 9.) As the court noted, the social services agency was *not* arguing that the mother had failed to raise the issue at the latest hearing below. (*Id.* at p. 9.)

Nevertheless, article VI, section 13 of the California Constitution demands that there be *some* indication of prejudice — to the father *or* to the tribes — before we reverse a final order terminating parental rights.

The father also argues that a "requirement that the appellant must submit evidence *outside the record* is a substantial departure from normal appellate procedure." We agree. However, it is a departure that favors him. Ordinarily, he would have to show prejudice based on the record, which he cannot do. In a case in which a parent is claiming the child has Indian ancestry, but the social services agency failed to carry out its duty of inquiry, we make an exception. We do so because, for the purpose of determining whether ICWA applies, California has chosen to cast the net widely. It has placed "an affirmative and continuing duty" on the juvenile court and the social services agency "to inquire whether a child . . . is or *may be* an Indian child." (§ 224.2, subd. (a), italics added.)

Nevertheless, a child is an Indian child if and only if he or she "is either (a) *a member* of an Indian tribe or (b) is eligible for membership in an Indian tribe and is *the biological child of a member* of an Indian tribe . . . ." (25 U.S.C. § 1903(4), italics added; see also § 224.1, subd. (a).) When the parent can make no good-faith claim that the child has Indian ancestry, the possibility that an inquiry would nevertheless show that the child *is* an Indian child is de minimis. It would be wasteful and a mere delaying tactic to require the trial court and the social services agency to go through the full inquiry process. "In the absence of such a representation, the matter amounts to nothing more

11

than trifling with the courts. [Citation.]" (*In re Rebecca R.*, *supra*, 143 Cal.App.4th at p. 1431.)

We acknowledge the "general" rule that we cannot "receive and consider postjudgment evidence that was never before the juvenile court[] and rely on such evidence outside the record on appeal to reverse the judgment[.]" (*In re Zeth S.* (2003) 31 Cal.4th 396, 399.) However, "in the rare and compelling case an exception may be warranted." (*Id*. at pp. 399-400.)

*In re A.B.* (2008) 164 Cal.App.4th 832 held that such an exception was warranted on facts that were not meaningfully different from those here. There, the father claimed on appeal that the social services agency had failed to inquire into the mother's Indian ancestry. (*Id*. at p. 835.) The appellate court took judicial notice of an ICWA-020 that the mother had filed in another dependency, saying she had no Indian ancestry; based on that document, it held that the error was harmless. (*Id*. at p. 843.)

It rejected the father's contention that this violated *Zeth S.* Its analysis, although on the long side, is worth quoting almost in full:

"*Zeth S.* . . . is distinguishable. In that case, the mother appealed the termination of her parental rights on the ground the court erred by finding the beneficial parent-child relationship exception to adoption was inapplicable. In an unsworn letter brief, the child's appellate counsel represented that she had investigated current circumstances and learned the mother visited regularly and assumed a parental role, and the grandfather felt pressured to adopt and would rather be a legal guardian. [Citation.] The Supreme Court

disapproved of the Court of Appeal's consideration of postjudgment circumstances 'as a means of reexamining the mother-child relationship,' because 'that was a settled matter which, by statutory directive, could not be reopened for reconsideration by mother, not even at the termination hearing itself.' [Citation.]

"The *Zeth S.* court held that 'consideration of postjudgment evidence of changed circumstances in an appeal of an order terminating parental rights, and the liberal use of such evidence to reverse juvenile court judgments and remand cases for new hearings, would violate both the generally applicable rules of appellate procedure, and the express provisions of section 366.26 which strictly circumscribe the timing and scope of review of termination orders, for the very purpose of expediting the proceedings and promoting the finality of the juvenile court's orders and judgment.' [Citation.]

"In *In re Josiah Z.* (2005) 36 Cal.4th 664, . . . the court clarified that in *Zeth S.*, it held 'an appellate court should not consider postjudgment evidence *going to the merits of an appeal* and introduced for the purposes of attacking the trial court's judgment.' [Citation.] In *Josiah Z.*, the children's appellate counsel moved to dismiss their appeal on the ground she had investigated and found their current nonrelative placement satisfactory, and dismissal would be in the children's best interests. The court rejected the notion that *Zeth S.* precluded counsel's best interests assessment. [Citation.]

"The court explained in *Josiah Z.* that the California Rules of Court authorize a motion to dismiss and appellate courts routinely consider postjudgment evidence in support of such motions; 'the limited issue involved in a motion to dismiss, whether a

13

child should be permitted to abandon a challenge to the trial court ruling, is distinct from the broader issues resolved by the trial court, and consideration of circumscribed evidence in this context does not give rise to the vice we condemned in *Zeth S.* — an appellate court's use of new evidence outside the record to second-guess the trial court's resolution of issues properly committed to it by the statutory scheme'; and 'the beneficial consequence of motions to dismiss, where granted, will be to "expedit[e] the proceedings and promot[e] the finality of the juvenile court's orders and judgment" [citation] — precisely the policy advanced by our ruling in *Zeth S.*' [Citations.]

"This case is more akin to *Josiah Z.* than *Zeth S.* In contrast to *Zeth S.*, the postjudgment evidence is not presented in an unsworn statement of counsel. Rather, the Agency submitted to the juvenile court a certified copy of a court record from another county, which is subject to judicial notice. . . . Further, the Agency did not seek to augment the record with evidence pertaining to the substantive merits of the juvenile court's termination of parental rights, and the evidence cannot be used to reverse the judgment on substantive grounds. The ICWA inquiry issue is distinct from the substantive merits of the court's ruling . . . . Also, admission of the evidence to affirm the judgment would promote the finality of the judgment and prevent further delay." (*In re A.B.*, *supra*, 164 Cal.App.4th at pp. 840-841.)

For much the same reasons, this case, too, is more akin to *Josiah Z.* than *Zeth S.* Rather than taking judicial notice of a parent's statement that they do not have Indian ancestry, we are relying on a parent's telling failure to state that they do; however, these

seem like two sides of the same coin. Consideration of the father's silence on this point to affirm the judgment promotes finality and prevents further delay.

If the father did claim Indian ancestry, we would reverse, but only because the Department failed in its duty of inquiry, which *A.B.* held is distinct from the substantive merits of the trial court's ruling. We would not act as trier of fact. We would not consider any other evidence, whether corroborating or contrary; we would not make a finding on whether the claim is true. We would simply allow the facts to be developed below.

In sum, we adhere to our opinion in *Rebecca R.* It is no outlier; to the contrary, every appellate court that has considered the question has come to the same conclusion, with the lone exception of *In re J.N.*, *supra*, 138 Cal.App.4th 450. We therefore conclude that reversal is not required.

IV

DISPOSITION

The order appealed from is affirmed.

CERTIFIED FOR PUBLICATION

RAMIREZ  
P. J.

I concur:

McKINSTER  
J.

15

[*In re A.C.; CFS v. D.M.,* E075333]

MENETREZ, J., Dissenting.

It is undisputed that neither the trial court nor San Bernardino County Children and Family Services (CFS) conducted any inquiry or investigation into the Native American ancestry of D.M. (Father). The majority opinion nevertheless affirms the order terminating Father's parental rights on the ground that Father has not shown prejudice. According to the majority opinion, in order to obtain a reversal Father must assert on appeal that he has Native American ancestry, even though the record contains no support for that assertion because CFS and the trial court never investigated.

The majority opinion conflicts with this court's recent decisions in *In re K.R.* (2018) 20 Cal.App.5th 701 (*K.R.*) and *In re N.G.* (2018) 27 Cal.App.5th 474 (*N.G.*). It is also in tension with the Supreme Court's decision in *In re Isaiah W.* (2016) 1 Cal.5th 1 (*Isaiah W.*) and is based entirely on a case, *In re Rebecca R.* (2006) 143 Cal.App.4th 1426 (*Rebecca R.*) that predates *Isaiah W.* And both the majority opinion and *Rebecca R.* conflict with another Supreme Court case, *In re Zeth S.* (2003) 31 Cal.4th 396 (*Zeth S.*). I therefore respectfully dissent.

The record contains no evidence about whether Father has any Native American ancestry (because the trial court and CFS never inquired) and thus contains no evidence about whether Father's child, A.C., might consequently be an Indian child within the meaning of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.). It is therefore impossible for Father to make an affirmative showing of prejudice. He is

1

required to cite the record for any factual assertions that he makes on appeal (Cal. Rules of Court, rule 8.204(a)(1)(C); *Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.* (2011) 194 Cal.App.4th 839, 846), but the record is silent because of the trial court's and CFS's violation of their federal and state law duties to inquire (25 C.F.R. § 23.107(a) (2016); Welf. & Inst. Code, § 224.2, subd. (a)).[1]  The majority opinion recognizes that the record's silence is the result of the trial court's and CFS's errors, but it affirms nonetheless because Father does not assert on appeal that he has Native American ancestry.  (Maj. opn., *ante*, at pp. 2, 8.)

That approach is legally unsound.  As Justice McKinster cogently explained in *K.R.*, "ICWA compliance presents a unique situation, in that, . . . although the parent has no burden to object to deficiencies in ICWA compliance in the juvenile court, the parent may nevertheless raise the issue on appeal.  (*Isaiah W.*, *supra*, 1 Cal.5th at pp. 6, 9, 14-15.)  The purpose of ICWA and the California statutes is to provide notice to the tribe sufficient to allow it to determine whether the child is an Indian child and whether it

---

[1]     The majority opinion errs by treating the inquiry violation here as a matter of only state law.  (Maj. opn., *ante,* at p. 8.)  The federal duty of inquiry was imposed by regulations promulgated in 2016.  (*In re T.G.* (2020) 58 Cal.App.5th 275, 289; Indian Child Welfare Act Proceedings, 81 Fed.Reg. 38779, 38802-38803, 38856 (June 14, 2016).)  This point would appear to vitiate much of the majority opinion's analysis, which is based on cases that predate the creation of the federal duty of inquiry and expressly rely on the absence of such a duty.  (Maj. opn., *ante*, at p. 8 [citing *In re S.B.* (2005) 130 Cal.App.4th 1148, *In re Noreen G.* (2010) 181 Cal.App.4th 1359, *In re H.B.* (2008) 161 Cal.App.4th 115, *In re N.E.* (2008) 160 Cal.App.4th 766, and *Rebecca R.*, which was decided in 2006].)  I am not aware of any authority for the majority opinion's conclusion that the federal duty of inquiry is automatically discharged as to any parent who is "unavailable" at the time of the detention hearing.  (Maj. opn., *ante*, at p. 9.)  Father was incarcerated at the inception of this case.  He was not present at the detention hearing but was contacted less than one month after the petition was filed.

2

wishes to intervene in the proceedings. (*Isaiah W.*, at pp. 8–9, 15.) The parent is in effect acting as a surrogate for the tribe in raising compliance issues on appeal. Appellate review of procedures and rulings that are preserved for review irrespective of any action or inaction on the part of the parent should not be derailed simply because the parent is unable to produce an adequate record." (*K.R.*, *supra*, 20 Cal.App.5th at p. 708.)

Relying on *K.R.*, Justice Fields developed the point further in *N.G.*: "[I]n a case such as this one, where the record does not show what, if any, efforts the agency made to discharge its duty of inquiry [citations] . . . , the burden of making an adequate record demonstrating the court's and the agency's efforts to comply with ICWA's inquiry and notice requirements must fall squarely and affirmatively on the court and the agency. In the absence of an appellate record affirmatively showing the court's and the agency's efforts to comply with ICWA's inquiry and notice requirements, we will not, as a general rule, conclude that substantial evidence supports the court's finding that proper and adequate ICWA notices were given or that ICWA did not apply. Instead, as a general rule, we will find the appellant's claims of ICWA error prejudicial and reversible." (*N.G.*, *supra*, 27 Cal.App.5th at p. 484.)

In effect, the approach taken by *K.R.* and *N.G.* would treat ICWA inquiry violations like the one in this case as presumptively prejudicial, putting the burden on the trial court and the child welfare agency to compile a record showing that their errors were harmless. As of January 1, 2020, the Judicial Council has largely incorporated the holdings of *K.R.* and *N.G.* into the Rules of Court, requiring the child welfare agency to

3

make a record of its ICWA compliance efforts. (Cal. Rules of Court, rule 5.481(a)(5) [the agency must "include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes"].)

The majority opinion applies the rule of *Rebecca R.*, *supra*, 143 Cal.App.4th 1426. (Maj. opn., *ante*, at p. 9.) I would decline to follow that case for at least four reasons. First, it conflicts with our court's more recent decisions in *K.R.* and *N.G.*, as already explained.

Second, it predates by 10 years the Supreme Court's decision in *Isaiah W.*, which held that a parent can assert ICWA error on appeal from the termination of parental rights without having raised the issue previously. (*Isaiah W.*, *supra*, 1 Cal.5th at pp. 6, 9, 14-15.) *K.R.* and *N.G.* derive their prejudice analysis from that holding. (*K.R.*, *supra*, 20 Cal.App.5th at p. 708; *N.G.*, *supra*, 27 Cal.App.5th at p. 483.)

Third, *Rebecca R.*'s analysis is expressly based on a false factual premise, namely, that "[t]he knowledge of any Indian connection is a matter wholly within the appealing parent's knowledge and disclosure is a matter entirely within the parent's present control." (*Rebecca R.*, *supra*, 143 Cal.App.4th at p. 1431.) That is incorrect. As more recent cases have recognized, a legally adequate investigation might reveal facts about parents' Native American ancestry that the parents did not know themselves. (See *In re T.G.* (2020) 58 Cal.App.5th 275, 295 [duty to conduct ICWA inquiry "is premised on the

4

commonsense understanding that, over time, Indian families, particularly those living in major urban centers like Los Angeles, may well have lost the ability to convey accurate information regarding their tribal status"].)

Fourth, *Rebecca R.* was legally wrong when it was decided in 2006, because it conflicts with the Supreme Court's decision in *Zeth S.*, *supra*, 31 Cal.4th 396. The Supreme Court held that "[i]n a juvenile dependency appeal from an order terminating parental rights," the Court of Appeal is not permitted to "receive and consider postjudgment evidence that was never before the juvenile court, and rely on such evidence outside the record on appeal to reverse the judgment," subject to a narrow exception for certain "rare and compelling case[s]." (*Id.* at p. 399; see *id.* at p. 413 & fn. 11.) In *Zeth S.*, the "evidence" in question consisted of "the unsworn statements of the minor's appointed appellate counsel in a letter brief." (*Id.* at p. 400.) But three years after *Zeth S.* was decided, *Rebecca R.* held that appellate counsel and this court are required to do what *Zeth S.* forbids: Counsel must submit, and this court must consider, postjudgment "evidence"—in the form of either a declaration or unsworn statements in a brief—on appeal in support of an attack on an order terminating parental rights. (*Rebecca R.*, *supra*, 143 Cal.App.4th at p. 1431.)

The majority opinion attempts to reconcile *Rebecca R.* with *Zeth S.* by relying on *In re A.B.* (2008) 164 Cal.App.4th 832 (*A.B.*) and *In re Josiah Z.* (2005) 36 Cal.4th 664 (*Josiah Z.*), but that reliance is misplaced. In *A.B.*, the appellate court considered new evidence (a parent's declaration denying Native American ancestry in a prior dependency

5

case) *as a basis for affirming* the termination of parental rights. (*A.B.*, *supra*, at pp. 835-836.) In *Josiah Z.*, the Supreme Court held that minor's appellate counsel may, in certain circumstances, introduce new evidence on appeal *in support of counsel's request to dismiss minor's own appeal.* (*Josiah Z.*, *supra*, at pp. 671-672.) Thus, in both cases the new evidence supported rejection of the appellate attack on the termination of parental rights.

It is consequently unsurprising that both *A.B.* and *Josiah Z.* are consistent with *Zeth S.*, in which the issue was whether the Court of Appeal may "receive and consider postjudgment evidence that was never before the juvenile court, and *rely on such evidence outside the record on appeal to reverse the judgment*." (*Zeth S.*, *supra*, 31 Cal.4th at p. 400, italics added; see *id.* at p. 407 [the issue under review was whether an appellate court may "look to postjudgment evidence that is outside the record on appeal and was never considered by the trial court . . . to reverse the trial court's judgment terminating parental rights"]; *Josiah Z.*, *supra*, 36 Cal.4th at p. 676 [explaining that *Zeth S.* held that "an appellate court should not consider postjudgment evidence going to the merits of an appeal and introduced for the purposes of attacking the trial court's judgment"].) The rationale of *Zeth S.* concerned "the state's strong interest in the expeditiousness and finality of juvenile dependency proceedings." (*Zeth S.*, at p. 412.) Admitting new evidence on appeal to support reversal undermines that interest. Admitting new evidence to support affirmance or dismissal of the appeal does not. (See *Josiah Z.*, at p. 676 ["the beneficial consequence of motions to dismiss, where granted,

6

will be to 'expedit[e] the proceedings and promot[e] the finality of the juvenile court's orders and judgment' [citation]—precisely the policy advanced by our ruling in *Zeth S.*"].)

The majority opinion's argument that *Rebecca R.* is consistent with *Zeth S.* therefore fails. Again, *Rebecca R.* requires precisely what *Zeth S.* forbids—the appellant must submit and the appellate court must consider new evidence in support of an attack on the termination of parental rights.

The majority opinion's contention that the rule of *Rebecca R.* "favors" Father is equally unpersuasive. (Maj. opn., *ante*, at p. 10.) The majority opinion purports to favor Father by *allowing* him to introduce new evidence or to make assertions that are not supported by the record. But the majority opinion does not stop there. Rather, it *requires* Father to do those things in order to prevail. Imposing that unique burden on Father does not help him. Father will be justifiably puzzled to learn that a rule that "favors him" (maj. opn., *ante*, at p. 10) is the only reason that he is losing this appeal.

*Rebecca R.* and the majority opinion put parents' appellate counsel in a strange and untenable position. Appellate attorneys ordinarily do not, need not, and are not paid to conduct any investigation of facts outside the record. (Cf. *Josiah Z.*, *supra*, 36 Cal.4th at pp. 671-672 [minor's appellate counsel may seek but need not be granted funds necessary to investigate facts outside the record].) But in a case like this one, *Rebecca R.* and the majority opinion require Father's counsel to interview Father about his Native American ancestry and then, in defiance of *Zeth S.*, provide the information to the Court

7

of Appeal as a basis for reversal. And what if counsel is unable to interview Father in time? Parents in dependency cases are sometimes homeless or otherwise hard to find. If counsel cannot reach Father, must counsel interview paternal relatives? Moreover, a parent appealing from the termination of parental rights can assert ICWA error as to a nonappealing parent. (See, e.g., *N.G.*, *supra*, 27 Cal.App.5th at pp. 477-478.) Must counsel for the appealing parent interview the nonappealing parent? Just how much of the trial court's and CFS's jobs does the majority opinion reassign to appellate counsel?

For all of these reasons, I respectfully dissent. The order terminating parental rights should be conditionally reversed, and the case should be remanded for ICWA inquiry and investigation as to Father.

MENETREZ

J.

8